**NATURAL RESOURCES DEFENSE COUNCIL, INC., Citizens for a Better Environment, Inc., Northwestern Ohio Lung Association, Inc., Petitioners,**

v.

**Anne M. GORSUCH, Administrator, U. S. Environmental Protection Agency,**

**American Petroleum Institute, et al., American Iron and Steel Institute, Rubber Manufacturers Association, Inc., General Motors Corporation, Alabama Power Company, et al., Chemical Manufacturers Association, Intervenors.**

No. 81–2208.

United States Court of Appeals, District of Columbia Circuit.

Argued May 21, 1982.

Decided August 17, 1982.

David D. Doniger, Washington, D. C., for petitioners.

Jose R. Allen, Atty., Dept. of Justice, Boston, Mass., of the bar of the Supreme Court of Mass., pro hac vice by special leave of Court for respondent. David E. Menotti, Associate Gen. Counsel, Lydia N. Wegman, Asst. Gen. Counsel, Eric Smith, Atty., EPA, Donald Stever and Nancy Bryson, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondent.

Patricia A. Barald, Washington, D. C., with whom Theodore L. Garrett, Washington, D. C., for Chemical Mfrs. Ass'n, Charles F. Lettow, Janet L. Weller and Michael A. Wiegard, Washington, D. C., for Rubber Mfrs. Ass'n, Michael J. Halloran, San Francisco, Cal., for Chevron, U.S.A., Inc., Louis E. Tosi and William L. Patberg, Toledo, Ohio, for General Motors Corp., Robert A. Emmett and William B. Peterson, Washington, D. C., for American Iron and Steel Institute, et al., Henry V. Nickel, Washington, D. C., for Alabama Power, et al., and Stark Ritchie and David T. Deal, Washington, D. C., for American Petroleum Institute were on the joint brief for the intervenors. Edmond B. Frost, Washington, D. C., also entered an appearance for intervenor Chemical Mfrs. Ass'n. Peter S. Everett, Washington, D. C., also entered an appearance for intervenors, Alabama Power Co., et al. Julius J. Hollis, Detroit, Mich., also entered an appearance for intervenor General Motors Corp. Walter R. Allan, San Francisco, Cal., also entered an appearance for intervenor American Petroleum Institute, et al.

Before MIKVA and GINSBURG, Circuit Judges, and WILLIAM J. JAMESON,* Senior United States District Judge for the District of Montana.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

This case involves a dispute between the Environmental Protection Agency ("EPA"), supported by industry intervenors, and petitioning environmental associations concerning EPA's application of a "bubble con-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

cept"[1] to a discrete Clean Air Act (or "Act") scheme, the new source review requirements for areas in which air quality does not meet federal standards ("nonattainment areas").[2] The controversy centers on the appropriate definition of the word "source" for the purpose of implementing the statutory scheme. Under EPA's current, bubble concept regulation, effective October 14, 1981,[3] source means an entire plant. Under the regulation previously in force,[4] an individual piece of process equipment within the plant ranked as a source. EPA changed its definition of source expressly to cut back substantially the coverage of nonattainment area new source review.[5]

In ruling upon EPA's regulatory change, we do not write on a clean slate. Our course is marked by two prior decisions in which panels of this court determined the applicability *vel non* of the bubble concept to distinct Clean Air Act programs. In *Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C.Cir.1979), the court held EPA *must* employ the concept in the Act's Prevention of Significant Deterioration ("PSD") regime, a scheme designed to *maintain* air quality in clean air areas; in *ASARCO, Inc. v. EPA*, 578 F.2d 319 (D.C.Cir.1978), the court *ruled out* application of the concept to

national new source performance standards ("NSPSs") which the Act directs EPA to set with a view to *enhancing* air quality. In each case the court focused on the purpose Congress envisioned for the particular program at issue. *ASARCO* declared the bubble concept impermissible when the congressional objective was improvement, rather than simply preservation, of existing air quality. See 578 F.2d at 327–29; *see also id.* at 330 (Leventhal, J., concurring) (challenged regulations would contravene congressional policy contemplating that modification of a facility would bring about air quality improvement). *Alabama Power* held the concept "precisely suited" to the congressional design when the intent was "to preserve [existing] air quality," rather than to improve it. 636 F.2d at 402.

 Congress, EPA does not dispute, intended the new source review requirements to operate not simply as a quality-maintaining scheme but specifically to promote the cleanup of nonattainment areas.[6] We are therefore impelled by the force of our precedent in *Alabama Power* and *ASARCO* to hold that EPA's regulatory change, its employment of the bubble concept to shrink to relatively small size mandatory new source review in nonattainment areas, is impermissible.[7]

1. Under this concept an entire plant and its emissions are viewed as if placed under one bubble. One then "look[s] at any change proposed for [the] plant and decide[s] whether the net effect of all the steps [taken in conjunction with the] change is to increase the emission of any air pollutant." Without the bubble concept, individual units of a plant affected by an operational change would be inspected to "determine whether any of the units will consequently emit more of a pollutant." *Alabama Power Co. v. Costle*, 636 F.2d 323, 401 (D.C.Cir. 1979); *see ASARCO, Inc. v. EPA*, 578 F.2d 319, 322 (D.C.Cir.1978).

2. *See* 42 U.S.C. §§ 7410(a)(2)(I), 7501–7508 (Supp. IV 1980).

3. 46 Fed.Reg. 50766 (1981) ("1981 Regulations").

4. *See* 45 Fed.Reg. 52676, 52696–98 (1980) ("1980 Regulations").

5. *See* 1981 Regulations, 46 Fed.Reg. at 50766.

6. *See* 1981 Regulations, 46 Fed.Reg. at 50769–70; EPA Brief at 27 (a "fundamental purpose of [the nonattainment program] is to enhance air quality").

During the floor debates on the 1977 Amendments to the Act, Senator Dole made the following statement comparing goals of the nonattainment and PSD programs:

For concentrated industrial areas [the amendments] will involve an effort to clean up ambient air quality to the extent possible, while for relatively "clean" areas like Kansas, the effort will involve a reasonable approach to maintaining healthy air standards in the face of future development.

123 Cong.Rec. 18167 (1977).

7. *See Potomac Alliance v. NRC*, 682 F.2d 1030, 1031 (D.C.Cir.1982) ("[m]indful of our rules with respect to the maintenance of uniformity in dispositions of like cases by different divisions of this court").

We express no view on the decision we would reach if the line drawn in *Alabama Power* and *ASARCO* did not control our judgment.

## I. BACKGROUND

### A. *The Statutory Framework*

Congress substantially redesigned the Clean Air Act in 1970 amendments [8] to better " 'protect and enhance the quality of the Nation's air resources.' " [9] The amendments established a comprehensive federal-state program to control existing and new sources of air pollution.[10] Central to the new design, Congress charged EPA to prescribe national ambient air quality standards ("NAAQSs"),[11] and required all states to adopt, and submit to EPA for approval, State Implementation Plans ("SIPs") that provide for the timely attainment of the NAAQSs.[12]

By 1976, it was clear that many regions of the country had failed to attain the primary NAAQSs within the statutory deadline, and remained distant from those national standards. In light of this shortfall, EPA endeavored to clarify, in an interpretive rule, the circumstances in which new sources of pollution would be permitted in areas where an ambient standard had not been achieved. EPA Interpretative Ruling of December 21, 1976 ("Offset Ruling"), 41 Fed.Reg. 55524 (1976); *see* S.Rep. No.127, *supra* note 12, at 55.[13] Congress, however, "[b]eliev[ed] that a statutory clarification of the question [was] needed," *id.*, and therefore added to its 1977 Clean Air Act Amendments,[14] Part D to Title I of the Act.[15]

**8.** Pub.L.No.91–604, 84 Stat. 1676 (1970).

**9.** *ASARCO*, 578 F.2d at 321 (quoting Clean Air Act § 101(b)(1), 42 U.S.C. § 1857(b)(1) (1970), and citing W. Rogers, Environmental Law § 3.1 (1977)).

**10.** This court has previously identified various motivations precipitating these amendments. *See, e.g., Alabama Power*, 636 F.2d at 346 (amendments were in response "to the growing perception of air pollution as a serious national problem"); *ASARCO*, 578 F.2d at 321 (amendments "were passed in reaction to the failure of the states to cooperate with the federal government in effectuating the stated purposes of the Act" and "were designed 'to improve the quality of the nation's air,' 84 Stat. 1676 (1970), by increasing the federal government's role in the battle against air pollution").

**11.** Section 109 of the Act, now codified at 42 U.S.C. § 7409 (Supp. IV 1980), required the Administrator of EPA to establish two sets of ambient air quality standards: "primary standards," "requisite to protect the public health," 42 U.S.C. § 7409(b)(1) (Supp. IV 1980); and "secondary standards," "requisite to protect the public welfare." *Id.* § 7409(b)(2).

**12.** The statute directed that SIPs provide for (1) attainment of primary standards "as expeditiously as practicable but ... in no case later than three years from the date of approval of such plan[s]" (not later than May 31, 1975, in most cases, *see* S.Rep.No.127, 95th Cong., 1st Sess. 55 (1977)); and (2) attainment of secondary standards within "a reasonable time." 42 U.S.C. § 7410(a)(2)(A) (Supp. IV 1980). Congress further instructed the Administrator of EPA to approve a submitted SIP if the plan met the requirements of the Act, *id.* § 7410(a), and if it did not, or if no plan was submitted, to propose and implement a plan for the state. *Id.* § 7410(c)(1).

**13.** Under the Offset Ruling, a "major" new or modified source would be allowed to locate in a nonattainment area "only if [certain] stringent conditions" could be met. 41 Fed.Reg. at 55528. First, emissions from existing sources in the region must be reduced by an amount greater than the contemplated emissions from the proposed new or modified source. *Id.* at 55529. Second, the source was "required to meet an emission limitation which specifies the lowest achievable emission rate for such type of source." *Id.* at 55528; *see also infra* note 20. Finally, the owner or operator of the proposed source had to certify that all existing sources in the area under the owner's or operator's control were in compliance with all applicable SIP requirements or on an approved compliance schedule. 41 Fed.Reg. at 55529. A "major" new or modified source was defined as any source which had an allowable emission rate of 100 or more tons per year (1000 tons for carbon monoxide). *Id.* at 55528.

This Ruling was later amended to conform to the 1977 Amendments to the Clean Air Act and codified as Appendix S to 40 C.F.R. Part 51. *See* 44 Fed.Reg. 3274 (1979).

**14.** The expanded nonattainment program was only one part of Congress' extensive 1977 revisions to the Clean Air Act. For detailed discussion of another major aspect of the 1977 Amendments, the PSD program, see generally *Alabama Power.*

**15.** Pub.L.No.95–95, 91 Stat. 685, 745–51, codified at 42 U.S.C. §§ 7501–7508 (Supp. IV 1980). The provisions of Part D, applicable to nonattainment areas as defined by Section 107(d) of the Act, 42 U.S.C. § 7407(d), are incorporated into the requirements of an adequate SIP. 42 U.S.C. § 7410(a)(2)(I).

Part D required states with nonattainment areas to submit revised SIPs not later than January 1, 1979. 42 U.S.C. § 7502 note (Supp. IV 1980). These revised SIPs must demonstrate that the primary NAAQSs will be attained "as expeditiously as practicable," but not later than December 31, 1982, or "if the State demonstrates to the satisfaction of the Administrator . . . that such attainment is not possible in an area with respect to either [ozone or carbon monoxide (or both)], . . . not later than December 31, 1987." *Id.* § 7502(a). The SIPs must also "provide for the implementation of all reasonably available control measures as expeditiously as practicable." *Id.* § 7502(b)(2). Until the NAAQSs are attained, "reasonable further progress" towards the standards must occur in each intervening year. *Id.* § 7502(b)(3).[16]

At the heart of the present dispute are two features of Congress' 1977 alterations: the Part D permit program, *id.* § 7502(b)(6), and the prohibition of major new construction in nonattainment areas lacking a SIP that meets the Part D requirements ("construction moratorium"), *id.* § 7410(a)(2)(I). Part D mandates that SIPs establish a permit program "for the construction and operation of new or modified major stationary sources" in nonattainment areas. *Id.*

§ 7502(b)(6).[17] States may issue a permit for construction or modification[18] of a major[19] source only if four conditions are met. First, the increased emissions from the proposed source must not exceed the allowance for growth identified and quantified in the SIP pursuant to 42 U.S.C. § 7502(b)(5) or, alternatively, the applicant must obtain sufficient reductions in emissions in the nonattainment area to offset the increased emissions from the proposed source. *Id.* § 7503(1). Second, the proposed source must comply with the "lowest achievable emission rate (LAER)."[20] *Id.* § 7503(2). Third, the applicant must demonstrate that all other major sources in the state under its control are in compliance (or are on a schedule for compliance) with applicable emissions limitations. *Id.* § 7503(3).

Finally, no permit may be issued unless the state is carrying out the applicable implementation plan for the nonattainment area in which the proposed source is to be located. *Id.* § 7503(4). If the nonattainment area lacks an EPA-approved SIP that meets Part D's requirements, the "construction moratorium" becomes operative and "no major stationary source [that would emit the nonattainment pollutant(s)] shall be constructed or modified in [the] area." *Id.* § 7410(a)(2)(I).[21]

---

16. The term "reasonable further progress" means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part [42 U.S.C. §§ 7501–7508] and section 7410(a)(2)(I) of this title and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 7502(a) of this title. 42 U.S.C. § 7501(1).

17. Emissions from mobile sources, not at issue here, are regulated by Title II of the Act, *id.* §§ 7521–7574.

18. " '[M]odification' means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." *Id.* § 7411(a)(4).

19. A "major" new source is one "which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant . . . ." *Id.* § 7602(j). *See also* 40 C.F.R. § 51.-18(j)(1)(v)(a) (1981). A "major" modification is one that results in a "significant" increase of any pollutant. *Id.* § 51.18(j)(1)(vi). The significance levels currently in force are:

Carbon monoxide: 100 tons per year (tpy)
Nitrogen Oxides: 40 tpy
Sulfur dioxide: 40 tpy
Particulate matter: 25 tpy
Ozone: 40 tpy of volatile organic compounds
Lead: 0.6 tpy

*Id.* § 51.18(j)(1)(xiii).

20. *See* 42 U.S.C. § 7501(3) (defining LAER).

21. The statutory provision for a "construction moratorium" carries a July 1, 1979, effective date. Prior to that date, EPA's Offset Ruling, *see supra* note 13, governed construction and modification of major pollution sources. 42 U.S.C. § 7502 note.

## B. *EPA's Regulations*

Part D, dense as it is, does not explicitly define what Congress envisioned as a "stationary source" to which the permit process and construction moratorium should apply. Nor is the issue squarely addressed in the legislative history. By regulation, EPA has twice attempted to provide a clear-cut answer. The response it gave on August 7, 1980, rested on the notion that Congress intended new source review to be "an important tool in the drive towards attainment of ambient air quality standards," 45 Fed.Reg. 52676, 52697 (1980) ("1980 Regulations"); EPA therefore designed its definition to subject to review more new construction projects in areas with unhealthy air than in areas where the legislative objective was simply to prevent significant deterioration of healthy air. On October 14, 1981, EPA, upon reconsideration, dramatically altered its "source" definition. This time, the agency focused on the "regulatory burdens and complexities" the 1980 definition entailed, 46 Fed.Reg. 16280, 16281 (1981), and on a "state flexibility" concern. 46 Fed.Reg. 50766, 50767 (1981) ("1981 Regulations"). To reduce the reach of the permit and moratorium requirements, EPA conformed the nonattainment area definition of source to the definition applicable, under the PSD program, in clean air areas.

### 1. *The 1980 Regulations.*

In its August 7, 1980, nonattainment program implementing regulations, 45 Fed. Reg. 52676 (1980), EPA defined as a "stationary source," "any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Act." *Id.* at 52746.[22] The regulations further defined "building, structure, [and] facility" to mean, essentially, an entire plant. *Id.*[23] "Installation," however, was defined as "an identifiable piece of process equipment." *Id.* Defining "source" as both a plant and an individual piece of equipment at a plant (a "source" within a "source") is commonly termed the "dual definition." *See id.* at 52696, 52697.[24]

EPA gave two imbricated reasons for adopting the dual definition to implement Part D of the Act. First, EPA inferred from the purpose, detail, and history of Part D that Congress intended application of new source review "to the greatest extent possible." *Id.* at 52697. "The dual

---

**22.** This specification is identical to the one Congress supplied for the term "stationary source" in the context of the NSPS program. 42 U.S.C. § 7411(a)(3); *see ASARCO*, 578 F.2d at 322. EPA appropriately used the same specification, although Congress had supplied none, in identifying the constituents of "stationary source" for purposes of the nonattainment program. *See Alabama Power*, 636 F.2d at 396. However, EPA, it is not disputed, has authority to define the constituent terms of source enumerated in the statute ("building, structure, facility, or installation") in a manner that will best effectuate "the expressed purposes of the Act." *Id.* In this case, EPA has maintained throughout, the agency may select the definition "best suited to the nonattainment program." 1981 Regulations, 46 Fed.Reg. at 50769; *see* 1980 Regulations, 45 Fed.Reg. at 52697. As *Alabama Power* and *ASARCO* illustrate, different delineations may be appropriate for different statutory programs. *See Alabama Power*, 636 F.2d at 402; *ASARCO*, 578 F.2d at 327 28.

**23.** EPA's precise definition reads:

"Building, structure, or facility" means all of the pollutant-emitting activities which be-

long to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control). Pollutant-emitting activities shall be considered as part of the same industrial grouping if they belong to the same "Major Group" (i.e., which have the same two-digit code) as described in the following document, *Standard Industrial Classification Manual, 1972*, as amended by the 1977 Supplement (U. S. Government Printing Office stock numbers 4101–0066 and 003–005–00176–0, respectively).

1980 Regulations, 45 Fed.Reg. at 52746.

**24.** Simultaneously, EPA rejected the dual definition for the PSD program, defining "installation" in that context, along with "building," "structure," and "facility," to mean an entire plant. *See id.* at 52693 (fundamental difference in purpose of the PSD provisions (to prevent air quality deterioration) and the nonattainment provisions (to reduce emissions) requires a different approach to defining the sources that will be subject to new source review).

definition, by defining individual units as a 'source,' will bring more units in for review in areas with unhealthy air," EPA stated, therefore "use of [this] definition clearly is more consistent with Congressional intent." *Id.* Second, EPA observed that "the purpose of the nonattainment provisions is to 'positively reduce emissions,' not merely to hold emissions constant." *Id.* EPA therefore concluded that the dual definition "comports with the purposes of Part D," while "use of a plantwide definition to avoid new source review would appear to be inappropriate in nonattainment areas." *Id.*[25]

The August 7, 1980, regulations contained a further provision at issue here. EPA ruled that "reconstructed facilities" at a plant would be treated as new sources rather than modifications of existing sources. *Id.* at 52744. "Reconstruction" would be presumed whenever "the fixed capital cost of the new components exceeds 50 percent of the fixed capital cost of a comparable entirely new stationary source." *Id.*

### 2. *The 1981 Regulations.*

On October 14, 1981, the EPA repealed the dual definition trigger for new source review in nonattainment areas and adopted a plantwide definition of "stationary source." 46 Fed.Reg. 50766 (1981).[26] Two concerns, EPA asserted, motivated this volte-face. First, regulatory complexity

would be reduced for now the same definition of "source" would apply to both the PSD and nonattainment programs. *Id.* at 50767. Second, "and more important," EPA said, the action is faithful to Congress' mandate that states "play the primary role in pollution control," for the plantwide definition of source "allow[s] states much greater flexibility in developing their nonattainment ... programs." *Id.*[27]

EPA also deleted the requirement that reconstructed facilities, as defined in the August 7, 1980, regulations, be treated as new sources; the agency explained:

> Adoption of the plantwide definition means that the reconstruction requirement applies only to entire plants which are rebuilt. Since few if any such reconstructions are anticipated, there is little reason to retain this requirement. In addition, deletion of the requirement makes the PSD and nonattainment rules the same in this respect.

*Id.*

On November 18, 1981, Natural Resources Defense Council, Inc., Citizens for a Better Environment, Inc., and Northwestern Ohio Lung Association, Inc. (collectively "Petitioners") filed the instant petition for review of EPA's October 14, 1981, regulations. Various members of the industrial community intervened in support of the altered regulations.[28]

---

**25.** EPA recognized that "use of different definitions for PSD and nonattainment areas adds to the complexity of the permitting process," but regarded this additional complexity as "outweighed by the need for a more inclusive definition of source in nonattainment areas in order to assure attainment of standards." *Id.* at 52697.

**26.** The practical effect of this revision was to apply the "bubble concept" to the nonattainment program. *See supra* note 1. Under this concept, only if the net emission increase from the plant as a whole is above the statutory or regulatory tripwire would the project qualify as a major new or modified source. *See ASARCO,* 578 F.2d at 322. Therefore, an operator of an existing plant could avoid the permitting process by "offsetting any increase in pollution caused by a change in the plant ... against a decrease in pollution from other units within the plant." *Id.*

**27.** On March 12, 1981, EPA announced the proposed change in the scope of nonattainment area new source review as a decision "made in the context of a Government-wide reexamination of regulatory burdens and complexities that is now in progress." 46 Fed.Reg. 16280, 16281 (1981) ("Notice"). EPA cited its concern that the dual definition "is excessively and unnecessarily burdensome," *id.,* but it did not then publish its concern, later identified as "more important," to increase options and flexibility for the states.

**28.** Some of the intervenors had petitioned this court to review EPA's August 7, 1980, regulations. *Chemical Manufacturers Ass'n v. EPA,* Nos. 80–1973 et al. (filed Aug. 15, 1980), *consolidated with* Nos. 79–1112 et al. (Dec. 15, 1980). On February 22, 1982, in response to promulgation of the October 14, 1981, revisions, a settlement agreement in that case was filed with this court.

## II. Analysis

### A. The Bubble Concept

As stated at the outset, the central issue confronting us is whether EPA's discretion under the Clean Air Act is sufficiently broad to allow it to apply the bubble concept to the nonattainment program. Our decision, we earlier observed, is controlled by two recent adjudications of this court determining the propriety of the bubble concept as applied to two other Clean Air Act programs. We now turn to a closer examination of those prior decisions.

In *Alabama Power* this court concluded that EPA, to act consistently with the purposes of the PSD program (Part C of Title I of the Act),[29] must apply the bubble concept to that regulatory scheme. 636 F.2d at 401–02. In reaching this conclusion the court reviewed, in light of Part C's language and its legislative history, definitions EPA had issued for the PSD program.

First, the court stated that in the absence of contrary congressional intent, the word "source" is to be defined consistently throughout the Act, as Congress defined it explicitly in Section 111(a)(3), to "mean[ ] any building, structure, facility, or installation ...."[30] Finding no contrary legislative intent with respect to the PSD program, the court held that the Section 111(a)(3) definition governed all PSD provisions. 636 F.2d at 396. Therefore, the court ruled, EPA exceeded its authority when it augmented the components of "source," for Part C definitional purposes, to embrace "any structure, building, facili-

ty, *equipment*, installation, *or operation (or combination thereof) ....*" *See id.* at 395 (emphasis in original).

However, the court further ruled that EPA has discretion to define, by regulation, the four components of the word "source" (building, structure, facility, and installation) "to carry out the expressed purposes" of the program at issue. *See id.* at 396. In sum, the court recognized that EPA might adopt for one Clean Air Act program regulations defining "the component terms of 'source' that are different in scope from" regulations employed in another program "due to differences in the purpose and structure of the two programs." *Id.* at 397–98.

Applying this analysis, the court declared the bubble concept "precisely suited" to the goals of the PSD program, "*preserv[ing]* air quality within a framework that allows cost-efficient, flexible planning for industrial expansion and improvement." *Id.* at 402 (emphasis added).[31] A point-specific definition of source, in the *Alabama Power* panel's view, would be "contrary to the expressed purposes of the PSD provisions of the Act." *Id.* at 401.[32] The panel regarded its decision as entirely in harmony with this court's decision less than two years earlier in *ASARCO, Inc. v. EPA,* for "*ASARCO* ... dealt with a significantly different regulation and statutory purpose." *Id.* at 402; *cf. infra* note 37.

In *ASARCO* the court "rejected *in toto*" EPA's application of the bubble concept[33] to the NSPS program.[34] 578 F.2d at 325,

---

**29.** 42 U.S.C. §§ 7470–7491 (Supp. IV 1980).

**30.** *Id.* § 7411(a)(3).

**31.** Accommodating this conclusion within its holding that Congress had constrained EPA's authority to identify the component terms of "source," the court observed that "installation ... in its common usage" can mean an entire plant. 636 F.2d at 397.

**32.** The court acknowledged that Congress did not specify, in either the language or the legislative history of Part C, "which of [the] two constructions [the bubble concept or the individual unit approach] was to be controlling." *Id.* (footnote omitted).

**33.** Specifically, EPA had adopted regulations which defined "stationary source" to mean "any building, structure, facility or installation which emits or may emit any air pollutant and *which contains any one or combination of the following*:
(1) *Affected facilities.*
(2) *Existing facilities.*
(3) *Facilities of the type for which no standards have been promulgated in this part.*"
*See* 578 F.2d at 324 (quoting 40 C.F.R. § 602(d) (1976)) (emphasis in original).

**34.** The NSPS program is designed to force new "sources" of pollution to employ the best demonstrated systems of emission reduction. 42 U.S.C. § 7411 (Supp. IV 1980).

326–27. In addition to finding the bubble regulations inconsistent with the plain language of the Act,[35] the court found them contrary to the basic purpose of the NSPS program, to "*improve* [ ] air quality." *Id.* at 327 (emphasis in original). "The bubble concept in the challenged regulations would undercut [the NSPS program] by allowing operators to avoid installing the best pollution control technology on an altered facility as long as the emissions from the entire plant do not increase."[36] *Id.* at 327–28.[37]

■ These decisions, particularly the *Alabama Power* panel's reconciliation of its holding with *ASARCO, see supra* note 37, establish as the law of this Circuit a bright line test for determining the propriety of EPA's resort to a bubble concept. The bubble concept, *Alabama Power* declares, is mandatory for Clean Air Act programs designed merely to maintain existing air quality; it is inappropriate, both *ASARCO* and *Alabama Power* plainly signal, in programs enacted to improve the quality of the ambient air.[38]

■ Applying the *Alabama Power-ASARCO* test to the nonattainment provisions of the Act, we must conclude that the bubble concept may not be employed in that scheme.[39] The nonattainment program's *raison d'être* is to ameliorate the air's quality in nonattainment areas sufficiently to achieve expeditious compliance with the

---

**35.** *Compare* 42 U.S.C. § 7411(a)(3) (Supp. IV 1980) *with* language quoted in note 33.

**36.** The court further stated:

Treating whole plants as single sources would grant the operators of existing plants permanent easements against federal new source standards—and the worst polluters would get the largest easements. The "best" pollution control technology would never have to be installed, and existing plants would use up much of the available clean air, inhibiting construction of new plants (which would comply with the NSPSs).

*Id.* at 329·30 n.40.

**37.** *ASARCO* was written broadly; one might well read it to imply that the bubble concept is inappropriate to any portion of the Clean Air Act. *See, e.g., id.* at 327, 329 ("we find that *any* version of the bubble concept is incompatible with the language of the Act and contrary to its [air quality enhancing] purpose") (emphasis in original). *Alabama Power* narrowed *ASARCO*'s scope by indicating that, although the Act as a whole is designed to enhance (not simply maintain) air quality, in ruling upon the application *vel non* of the bubble concept, the court must look to the purpose of the Clean Air program at issue.

**38.** EPA has attempted to reconcile *Alabama Power* and *ASARCO* differently. The agency asserts that the NSPS program reviewed in *ASARCO* "focuses exclusively on what demonstrated technology can achieve" on an individual piece of equipment. EPA Brief at 26. On the other hand, the PSD program examined in *Alabama Power* "is principally geared to the effects of emissions from a new or modified source on air quality." *Id.* It is a plant's *net* emission increase, EPA contends, which affects

air quality. *Id.* at 27. Describing Part D of the Act as geared to emissions rather than to technology, EPA readily concludes that the bubble concept is appropriately applied to the nonattainment program, just as it is to the PSD program, which is similarly oriented to the effect of emissions on air quality.

This attempted distinction is infirm. First, we note that the nonattainment scheme does contain technology-forcing provisions. *See* 42 U.S.C. § 7503(2) (Supp. IV 1980); *see also* H.R. Rep.No.294, 95th Cong., 1st Sess. 215, *reprinted* in 1977, U.S.Code Cong. & Ad.News 1977, 1294 ("the technology-forcing purpose . . . is best served by requiring maximum feasible pollution control from . . . new sources in dirty air areas"). Second, and of greater importance to our decision, the proffered distinction surely is not the one *Alabama Power* drew. That decision focuses cleanly on whether the program at issue is designed to improve or simply to maintain air quality. *See* 636 F.2d at 401–02.

**39.** Both Petitioners and Intervenors claim support for their opposing bubble concept positions in the 1977 Amendments' legislative history. *Compare* Brief for Petitioners at 42–44 *with* Brief for Industry Intervenor-Respondents at 37–39. We agree with EPA that "[w]ith regard to the actual content of the definition of 'source,' the legislative history is at best contradictory," EPA Brief at 17; therefore, the purposes of the nonattainment program should guide our decision here. *Id.* at 20. We regret, of course, that Congress did not advert specifically to the bubble concept's application to various Clean Air Act programs, and note that a further clarifying statutory direction would facilitate the work of the agency and of the court in their endeavors to serve the legislators' will.

NAAQSs.[40] *See supra* note 6 and accompanying text. This purpose comfortably places Part D on the "improving" side of the line drawn by *Alabama Power* and *AS-ARCO* and thus rules out application of the bubble concept to the nonattainment program.[41]

EPA argues that we have misperceived the purpose and nature of the nonattainment program. The agency asserts that a fundamental purpose of the nonattainment scheme is to afford the states flexibility in designing revised SIPs which will attain compliance with the NAAQSs. *See* EPA Brief at 20–23 (quoting H.R.Rep.No.294, *supra* note 38, at 211). The bubble concept, EPA argues, would further this statutory purpose by leaving the states with considerable authority to define source as they believe best-advised: they might adopt the bubble concept or, if necessary for timely attainment, a more stringent standard. Regardless of the method chosen, EPA maintains, the states remain under an obligation to submit and comply with a revised SIP that assures improved air quality. Fulfillment of the other prime purposes of the

nonattainment program, timely compliance with the NAAQSs and reasonable further progress toward that goal, EPA asserts, is thereby assured. Thus, EPA concludes, application of the bubble concept to the nonattainment scheme fits neatly within the "purpose" language of *Alabama Power*. We disagree.

As we recently pointed out, *see Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111, 118 & n.36 (D.C.Cir.1982), the legal significance of a word or phrase must be gleaned from the context in which it is used. In the *Alabama Power-ASARCO* context, "purpose" clearly means goal, objective. The goal of the nonattainment program is undoubtedly to improve air quality in regions lagging behind in meeting the NAAQSs. Offering flexibility to the states may be a method of attaining that objective, but it is not an independent goal of the nonattainment scheme.

We further note that the permit and moratorium provisions of Part D are wholly federal requirements imposed on the states. 42 U.S.C. § 7503 (Supp. IV 1980). The

**40.** EPA strenuously argues that the purpose of the construction moratorium, *see supra* p. 722, is solely to maintain the air's quality in nonattainment areas until the revised SIPs are in place. Therefore, EPA reasons, the bubble concept is eminently suitable for the moratorium program. *See* EPA Brief at 33–36. Petitioners dispute EPA's premise. They claim that the purposes of the moratorium are twofold, both directed at improving air quality: (1) to pressure the states into rapidly adopting revised SIPs; and (2) to prevent construction or modification of sources with less stringent pollution control than the revised SIP might require once implemented. Brief for Petitioners at 14. In light of these asserted purposes, Petitioners conclude that the bubble concept is incompatible with the moratorium program.

We need not resolve this dispute for EPA has examined the moratorium with tunnel vision. Whatever role the moratorium is to play, it has been cast, not as a discrete program, but as an integral part of a larger production, the nonattainment scheme. Application of the bubble concept to the moratorium, thereby excluding a significant portion of industry's activities from its provisions, would not serve the NAAQS achievement purposes and goals of the nonattainment program.

**41.** In promulgating the August 7, 1980, regulations, EPA clearly expressed its belief that the

dual definition, by "bring[ing] in more sources or modifications for review than would the plant-wide definition" was "more consistent with Congressional intent" to reduce emissions, improve air quality, and require better pollution control technology in nonattainment areas. 1980 Regulations, 45 Fed.Reg. at 52697–98. In explaining its October 14, 1981, revisions, EPA suggested just the opposite: the dual definition may in fact retard improvement in air quality by discouraging replacement of older processes or equipment with newer, cleaner varieties. 1981 Regulations, 46 Fed.Reg. at 50768; *see also* Notice, 46 Fed.Reg. at 16281. However, in abandoning its earlier position, EPA did not cite, nor have we found in the record, any study, survey, or support for the opposite position, now tendered by EPA, that the dual definition would indeed retard improvement of air quality *in the aggregate*. Therefore, EPA's decision to implement the bubble concept, if based on this rationale, would not rise to the level of reasoned decisionmaking for EPA "has some burden ... to show that a regulation once considered to [effectuate policy] efficiently can no longer be expected to do so." *State Farm Mut. Auto. Ins. Co. v. Department of Transportation*, 680 F.2d 206, 231 (D.C.Cir. 1982). Speculation is not enough.

states do not retain flexibility to submit SIPs which provide for timely attainment of the NAAQSs, but which do not contain a permit program applicable to new or modified sources.[42] Allowing the states large leeway to define the sources to which the federal requirement applies is not easily reconciled with the statutory design.

### B. *The Reconstruction Rule*

EPA explained that it deleted the reconstruction rule from the nonattainment program regulations because, upon the agency's adoption of the plantwide definition of source, the rule would do scant service. *See* 1981 Regulations, 46 Fed.Reg. at 50767; EPA Brief at 40; *supra* p. 13. The bubble concept, pursuant to our decision today, may not be employed in nonattainment program regulations. Therefore, EPA's incidental deletion of the reconstruction rule must be vacated together with the agency decision to which it is ancillary.[43]

### Conclusion

This court's prior adjudications in *Alabama Power* and *ASARCO* preclude us from sanctioning EPA's employment of the bubble concept in the Clean Air Act's nonattainment program. We therefore grant the petition for review and vacate EPA's October 14, 1981, regulations.

*So ordered.*

---

**42.** *See* 123 Cong.Rec. 18017 (1977) (statement of Sen. Muskie).

**43.** Intervenors proffer several alternative reasons supporting EPA's deletion of the reconstruction rule. *See* Brief for Industry Intervenor-Respondents at 59–66. However, it is a "central tenet of administrative law that a reviewing court may not affirm an administrative agency's actions on a reasoned basis different from the rationale actually put forth by the agency." *Public Media Center v. FCC*, 587 F.2d 1322, 1332 (D.C.Cir.1978); *see also Gulf States Util. Co. v. FPC*, 411 U.S. 747, 764, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).