CHEMICAL MANUFACTURERS
ASSOCIATION and Cement Kiln
Recycling Coalition, Petitioners

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent

Environmental Technology Council,
Inc., Intervenor

Nos. 99–1236, 99–1514.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 3, 2000.

Decided July 25, 2000.

Richard G. Stoll argued the cause for petitioners. With him on the briefs were David F. Zoll, Ronald A. Shipley, Michael W. Steinberg, Joshua D. Sarnoff and David P. Novello.

Christopher S. Vaden, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were Peter D. Coppelman, Acting Assistant Attorney General, and Steven E. Silverman, Attorney, Environmental Protection Agency.

David R. Case was on the brief for intervenor Environmental Technology Council, Inc.

Before: WILLIAMS, SENTELLE and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Dissenting Opinion filed by Circuit Judge SENTELLE.

TATEL, Circuit Judge:

Petitioners challenge an Environmental Protection Agency rule establishing an unusual bifurcated schedule for hazardous waste combustors to comply with strict new emission standards. To meet the new standards, combustors must either modify existing facilities and processes to bring emission levels below the new limits or cease burning hazardous waste altogether. Combustors electing to make the necessary changes have three years to comply, but under EPA's "early cessation" program, combustors that find it not cost-effective to make the required modifications must cease burning hazardous waste

within two years. Although we reject petitioners' argument that EPA lacks statutory authority to implement an early cessation program, we vacate the rule because, as the Agency concedes, it failed to establish that this particular early cessation program, which imposes substantial costs on hazardous waste combustors, will have any environmental or health benefits.

## I.

Three types of businesses burn hazardous waste. Professional hazardous waste treatment and disposal companies operate large commercial incinerators, charging fees to dispose of hazardous wastes generated by their customers. Some hazardous waste producers, such as chemical manufacturers, operate their own on-site incinerators to dispose of waste generated in the manufacturing process. Cement manufacturers operate kilns in which they occasionally supplement the fossil fuels they burn with hazardous waste to generate additional heat energy, to recover usable materials from treated waste, and to earn additional revenue from disposal fees. Petitioners Chemical Manufacturers Association and Cement Kiln Recycling Coalition represent the latter two types of hazardous waste combustors. Environmental Technology Council, intervenor in support of EPA's rule, represents commercial waste incinerators.

All three types of hazardous waste combustors are regulated by Subtitle C of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq., which "establishes a comprehensive 'cradle-to-grave' regulatory program for the treatment, storage, and disposal of hazardous waste." *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1252 (D.C.Cir. 1994). Existing EPA standards, promulgated pursuant to RCRA and upheld for the most part in *Horsehead*, require hazardous waste combustors to operate under conditions sufficient "to protect human health and the environment." 42 U.S.C. § 6924(a).

The Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 et seq., foregoing RCRA's risk-based approach in favor of technology-based regulation, directs EPA to establish emission standards for hazardous air pollutants based on the "maximum achievable control technology," known as MACT. 42 U.S.C. § 7412(g)(2). The EPA Administrator must list categories and subcategories of hazardous air pollutant emissions sources, then set MACT standards for each category at a level

> requir[ing] the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies.

42 U.S.C. § 7412(d)(2). Once EPA sets the emission standards, the Act, in language central to this case, requires the Agency to establish a "compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A). Sources demonstrating a need for additional time to complete installation of pollution control equipment qualify for a one-year extension. 42 U.S.C. § 7412(i)(3)(B).

Acting pursuant to RCRA and the Clean Air Act, EPA promulgated revised emission standards for hazardous waste combustors. *See* Revised Standards for Hazardous Waste Combustors, 61 Fed.Reg. 17,358 (1996). In the original notice of proposed rulemaking, EPA predicted that most affected combustors would have to make substantial modifications to their equipment in order to reduce emissions to levels mandated by the new standards. In order

to allow sufficient time for combustors to implement necessary modifications, EPA proposed its usual three-year compliance period. *Id.* at 17,416.

The Agency recognized that because certain combustors, namely kilns and on-site incinerators, burn hazardous waste as an adjunct to their primary business, they might find it more feasible to stop burning hazardous waste altogether rather than invest in new pollution controls. Cement kilns could switch to non-hazardous fuels, and operators of on-site incinerators might find it more cost-effective to contract with commercial hazardous waste incinerators. To "ensure that only those facilities that plan to comply with the new regulations are allowed to burn hazardous waste during the [three-year] compliance period," *id.*, EPA proposed an early cessation program under which kilns and on-site incinerators that decide against making the improvements necessary to continue burning hazardous waste under the new standards would be required to "immediately stop burning hazardous waste when the owner or operator first determines that [compliance will not be achieved] by the applicable date." *Id.*

After considering public comment, EPA adopted a final rule requiring owners and operators of hazardous waste combustion facilities to submit a Notification of Intent to Comply, known as a "NIC," within a year of the new standards' effective date. *See* Hazardous Waste Combustors; Revised Standards; Final Rule, 63 Fed.Reg. 33,782, 33,806–09 (1998). Each combustor must indicate in the NIC whether it plans to comply, *i.e.*, whether it plans to continue burning hazardous wastes under the new standards, and, if so, what emission-control measures it will take to ensure timely compliance. Combustors indicating an intent to comply must file a two-year Progress Report describing in detail all compliance modifications planned and undertaken; they must comply with the new standards within three years. *Id.* at 33,806. Kilns and on-site incinerators that indicate an

"intent not to comply"—the focus of this case—must cease burning hazardous waste within two years of the effective date. The Agency explained the process as follows:

> The source can use the NIC to notify either the source's intent to come into compliance with the new standards, or the source's intent not to come into compliance with the new standards. The NIC must be submitted to the permitting agency within a year of the final standards being promulgated, and the Progress Report within two years.
>
> . . . .
>
> The NIC will not serve as a basis for requiring facilities to cease burning hazardous waste if they intend to comply with the emission standards of this Subpart. . . . EPA would like to clarify that its intent has never been to shut a source down completely. The source might be required to cease burning hazardous waste; however, it would not be precluded from burning non-hazardous waste or other alternative fuels. However, those sources who indicate in the NIC their intent not to comply with the applicable emission control requirements of this Subpart will be required to stop burning hazardous waste within two years of the effective date of the emission control requirements.

*Id.* at 33,806–07.

Until this rulemaking, EPA had always set a single compliance date for each category of emission source; never before had it required emission sources to choose between complying or ceasing the regulated activity. Several commenters objected to the early cessation program, arguing that EPA lacks statutory authority to impose such an unprecedented requirement. The Agency responded:

> EPA believes that compliance as expeditiously as practicable will have numerous benefits for human health and the environment. In particular, for those sources that do not intend to ultimately come into compliance with the emission

standards of this Subpart, expeditious compliance would be achieved by ceasing to burn hazardous waste. The Agency anticipates that numerous sources will choose not to come into compliance with the requirements of this rule, and will cease burning hazardous waste prior to issuance of the rule or at some later date, but prior to the compliance date. This section is intended to expeditiously limit the burning of hazardous waste by those sources who do not intend to come into compliance with the requirements of the emission standards of this Subpart, but continue to burn hazardous waste after the effective date of the emission standards of this Subpart. These sources are, quite simply, able to meet the standards earlier than the three years allowed for sources which will continue to burn hazardous waste. Thus, for this class of facilities, EPA is creating a means of compliance "as expeditiously as practicable."

*Id.* at 33,810.

Petitioners challenge the early cessation program, claiming that although it imposes substantial costs, it will produce no environmental benefits because hazardous waste currently burned by kilns and on-site incinerators will simply be shifted to commercial incinerators operating under the same emission standards. Petitioners also contend that because CAA section 112(i)(3), 42 U.S.C. § 7412(i)(3), requires EPA to set compliance dates based on the technical feasibility of attaining the MACT standards, once EPA set a three-year deadline, it had no authority to require earlier cessation. Finally, petitioners challenge the Notice of Intent to Comply and the two-year Progress Report filing requirements.

EPA, supported by intervenor Environmental Technology Council, responds that because some sources will choose to comply by ceasing to burn hazardous waste rather than installing new pollution controls, and because that method of compliance can be achieved well before the three-year compliance date, early cessation is required by section 112(i)(3)(A)'s "compliance as expeditiously as practicable" mandate. EPA defends the NIC and Progress Report requirements as not only critical to enforcing the early cessation rule, but also as an important means of increasing public participation in RCRA's permit modification process.

## II.

We begin with Petitioners' argument that the early cessation program is arbitrary and capricious and exceeds EPA's authority under the Clean Air Act. According to petitioners, CAA section 112(i)(3)(A) requires EPA to set compliance dates based only on "the technical ability of facilities to attain timely compliance with the MACT standards." Once EPA determined that combustors need three years to comply, petitioners argue, then "no provision of the CAA provides any support for (1) specifying early compliance dates based on intentions to comply or (2) forcing facilities to cease burning waste prior to the established compliance date."

This argument requires little discussion. Petitioners point to nothing in either the CAA or RCRA that requires EPA to set a single uniform compliance date for all combustors. In fact, as the Agency points out, the CAA speaks in terms of "compliance date *or dates*" and requires "compliance as expeditiously as practicable, but *in no event later than* 3 years after the effective date of such standard." 42 U.S.C. 7412(i)(3)(A) (emphasis added). Responding to this directive, the Agency determined that combustors can achieve "compliance" not just through installation of pollution controls, but also through cessation of hazardous waste combustion. The Agency also determined that cessation can be accomplished more "expeditiously" than other compliance methods such as pollution controls. "These sources are, quite simply, able to meet the standards earlier than the three years allowed for sources

which will continue to burn hazardous waste." 63 Fed.Reg. at 33,810. Thus, the Agency argues, its early cessation rule is just an alternative compliance date tailored to an individual source's chosen method of compliance. "As a practical matter," the Agency explains in its brief, the early cessation rule simply "established two subcategories for compliance purposes here: sources complying by ceasing to burn hazardous wastes, and sources complying by other means (adding air pollution control devices, adopting waste minimization process changes, etc.)." Because EPA determined that compliance by cessation requires less time than compliance through installation of pollution controls, it in effect set two different compliance dates depending on which route a particular combustor elects to take.

Were there nothing more to this case, we would agree with EPA that section 112(i)(3)(A)'s requirement of "compliance as expeditiously as practicable" can be read to provide authority for an early cessation program. Indeed, at oral argument petitioners conceded that even under their reading of the CAA, EPA could accomplish precisely the same result by setting the compliance date for all combustors at two years rather than three and then granting one-year extensions to combustors electing to comply by installing emission control devices. *See* 42 U.S.C. 7412(i)(3)(B) (authorizing the Administrator to issue extension permits to sources "if such additional period is necessary for the installation of controls").

But this case is not so simple. EPA claimed in the rulemaking that its early cessation requirement would have "numerous benefits for human health and the environment." 63 Fed.Reg. at 33,810. Yet as the Agency now acknowledges, it neither pointed out what those benefits would be nor explained how any such benefits might result from the early cessation program. In issuing the rule, moreover, EPA expressly recognized that the early cessation program would result in hazard-

ous waste being shifted away from kilns and on-site incinerators that comply with existing RCRA standards but elect to cease burning hazardous waste rather than meet the new MACT standards. During the year between the early cessation and compliance dates, hazardous waste will simply be redirected to other facilities to be burned under essentially the same conditions.

> Combustion systems that can no longer cover costs ... are projected to stop burning hazardous waste. Hazardous wastes from these systems will likely be reallocated to other viable combustion systems at the same facility if there is sufficient capacity, alternative combustion facilities that continue burning, or waste management alternatives (*e.g.*, solvent reclamation). Because combustion is likely to remain the lowest cost option, we expect most reallocated wastes will continue to be managed at combustion facilities.

NESHAPS: Final Standards for Hazardous Air Pollutants for Hazardous Waste Combustors, 64 Fed.Reg. 52,828,53,017 (1999). In other words, the early cessation rule will not significantly reduce the amount of hazardous waste produced, the amount of hazardous waste burned, or the levels of hazardous air pollutant emissions. It will instead merely reallocate which combustion facilities process the same hazardous waste under the same conditions. At oral argument, EPA counsel candidly conceded that we must resolve this case on the assumption that the early cessation program may have no environmental benefits at all. Indeed, as petitioners point out, to the extent that transporting hazardous waste to commercial incinerators increases the risk of leakage, spills, or contamination, early cessation might even result in net environmental damage.

In view of the state of this record and EPA's concessions, we think that the Agency's action represents a classic case of arbitrary and capricious rulemaking. Not only did the Agency fail to "articulate a

satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks omitted), but by claiming "numerous benefits for human health and the environment," 63 Fed.Reg. at 33,810, where none was found, EPA "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856.

According to EPA, however, petitioners' arguments based on the absence of health or environmental benefits "miss the point." The point, the Environmental Protection Agency tells us, is not environmental protection. Instead, the Agency argues, it *must* implement the early cessation program regardless of environmental impact because CAA section 112(i)(3)(A) requires "compliance as expeditiously as practicable," and that phrase "appears to mandate EPA's selection of a two-year compliance date for sources choosing the compliance option of ceasing to burn hazardous wastes." EPA's argument goes like this: (1) "Compliance" with an emission standard must include "virtually any means of avoiding noncompliance." (2) "Compliance date" can thus be interpreted to include "the date that a source, subject to the rule because it burns hazardous waste, ceases air emissions attributable to burning those wastes." (3) Since "compliance" means cessation as well as installation of pollution controls, then "compliance as expeditiously as practicable" must require early cessation because cessation can be accomplished sooner than installation of emission-control equipment. (4) Allowing combustors intending to cease burning hazardous waste a full three years to continue burning would violate the statute's command to "provide for compliance as expeditiously as practicable" regardless of the environmental effect of requiring early cessation.

As with any question of statutory interpretation, we first ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In this case, the answer is no. Nothing in the Clean Air Act addresses whether "compliance as expeditiously as practicable" requires early cessation. Indeed, as the Agency concedes, neither the Act nor its legislative history suggests that Congress ever considered early cessation or the possibility that if EPA imposes a cessation deadline before a compliance deadline, sources not subject to early cessation but which burn no cleaner would take up the slack during the interim and produce the very same emissions level.

Since the Clean Air Act is "silent or ambiguous with respect to the specific issue," *id.* at 843, 104 S.Ct. 2778, we ask whether the Agency's interpretation of section 112(i)(3)(A) to mandate early cessation absent environmental benefit is "a permissible construction of the statute," *id.*, *i.e.*, whether it is "reasonable and consistent with the statute's purpose." *Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C.Cir.2000). The Clean Air Act's purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," 42 U.S.C. § 7401(b)(1), constrained of course by section 112(i)(3)'s explicit concern over practicability. In its rulemaking, EPA, apparently recognizing that its regulations must be consistent with the Clean Air Act's goals, claimed that early cessation "will have numerous benefits for human health and the environment." 63 Fed.Reg. at 33,810. But having realized it had made no findings to support this claim, the Agency simply abandoned any attempt to reconcile its reading of section 112(i)(3)(A) with the statute's objectives. Indeed, nothing in the record suggests the early cessation program will, directly or indirectly, further the Clean Air Act's environmental goals.

We think it unreasonable for the Agency to have interpreted the phrase "compliance as expeditiously as practicable" as requiring it to impose costly obligations on regulated entities without regard to the Clean Air Act's purpose. *See, e.g., United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) ("Over and over we have stressed that '[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'") (quoting *United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850)). As we said in *Continental Air Lines, Inc. v. DOT,* "the critical point is whether the agency has advanced what the *Chevron* Court called 'a reasonable explanation for its conclusion that the regulations serve the ... objectives [in question].'" 843 F.2d 1444, 1452 (D.C.Cir. 1988) (quoting *Chevron,* 467 U.S. at 863, 104 S.Ct. 2778) (alteration in original). Here, EPA has failed to do so. *See also, e.g., Dole v. United Steelworkers of America,* 494 U.S. 26, 37, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) (rejecting agency's interpretation of a statute where "none of Congress' enumerated purposes would be served").

Unlike *Chevron, see dissenting op.* at 868–69, this case does not involve a policy disagreement between this court and EPA over which of two possible interpretations would best achieve the Clean Air Act's goals. Here, the Agency readily concedes it has no evidence to suggest the challenged program is consistent with the Act's aims. *See Continental Air Lines,* 843 F.2d at 1453 ("A judicial decision to the effect that an agency's interpretation *frustrates* the policies of Congress (or is inconsistent with the statutory mandate) is a far cry from a decision that the agency's approach *fails best to promote* Congress' purposes."). Given the absence of environmental benefits—indeed, the possibility of environmental harm—EPA violated the basic requirement that its actions must "not deviate from or ignore the ascertainable legislative intent." *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 520 (D.C.Cir.1983) (internal quotation marks omitted).

In reaching this conclusion, we emphasize that we do not question EPA's authority under the Clean Air Act to implement an early cessation program if it determines through reasoned decisionmaking that the program would produce environmental or health benefits. For example, if hazardous waste combustors that elect to comply with the MACT standards by modifying their processes or equipment phase in their new controls gradually over the three-year compliance period, it may well be that during the third year, these sources would be burning under much cleaner conditions. In that case, the hazardous waste that would have been burned by kilns and on-site incinerators would be redirected to facilities that are closer to compliance with the new standards, thus producing real environmental benefits. As the Agency concedes, however, the record contains no evidence of such benefits.

## III.

We turn finally to petitioners' challenge to the NIC and Progress Report requirements. EPA asserts that although these requirements were implemented primarily as means of enforcing the early cessation rule, they serve the independent purpose of increasing public participation in the RCRA permit modification process which this rule streamlined. Petitioners disagree, claiming not only that the reporting requirements are integrally related to the early cessation rule, but that they go far beyond the level of disclosure and public participation required under previous RCRA regulations.

Because it is impossible for us to determine from this record that EPA would have promulgated the NIC and Progress Report requirements absent the early cessation rule, we must vacate these provi-

sions as well. *See, e.g., Davis County Solid Waste Management v. E.P.A.*, 108 F.3d 1454, 1459 (D.C.Cir.1997) ("Severance and affirmance of a portion of an administrative regulation is improper if there is substantial doubt that the agency would have adopted the severed portion on its own." (internal quotation marks omitted)). Of course, this leaves EPA free to promulgate new reporting requirements if it has some independent basis for doing so, consistent with the statutes' purposes.

The petition for review is granted and the rule is vacated.

*So ordered.*

SENTELLE, Circuit Judge, dissenting:

While the majority correctly describes EPA's bifurcated compliance program as "unusual," EPA sees the compliance mechanism as an innovative approach to implementing a congressional command. However it is styled, as judges, we cannot second guess EPA's approach as long as the agency acted pursuant to statutory authority and did so reasonably. Here, EPA devised a reasonable approach to implement a reasonable interpretation of a congressional mandate to achieve "compliance as expeditiously as practicable." Therefore, I would uphold the early cessation program as permissible under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and as a reasonable, lawful agency action.

I agree with the majority that section 112(i)(3)(A) vests EPA with the statutory authority to implement a bifurcated early cessation program. *See* Maj. Op. at 864–65. I also agree that EPA failed to substantiate its claim of health and environmental benefit associated with the implementation of the program. *See id.* at 865. I part company with the majority when it reads section 112(i)(3)(A) to require EPA to conduct an environmental impact analysis before ordering "compliance as expeditiously as practicable." I accept the majority's general premise that Congress intended the Clean Air Act, 42 U.S.C. § 7401 *et seq.* (1994), to further the goals of achieving environmental and health benefits. However, nowhere in section 112(i)(3)(A) does Congress order EPA to consider separately environmental or health benefits in carrying out the command to implement "compliance as expeditiously as practicable." It thus would appear at least reasonable to conclude that Congress itself determined that the statutorily mandated action by EPA of requiring such compliance is in furtherance of the general goal of the statute, without the agency's considering anew whether its specific acts also further general goals.

For the reasons set forth by the majority, tempered by Congress's decision not to impose a regulation-specific requirement concerning environmental and health benefits, I agree that "section 112(i)(3)(A)'s requirement of 'compliance as expeditiously as practicable' can be read to provide authority for an early cessation program." Maj. Op. at 864. Once that is said, I do not see that we have any other choice than to deny the petition for review and uphold the interpretation of EPA. This is precisely the teaching of *Chevron*. In *Chevron* itself, the Supreme Court reviewed a decision of this court setting aside an interpretation by EPA of a Clean Air Act provision in a fashion that did not in the view of this court advance the overall goals of the statutorily established program that EPA was administering. *See Natural Resources Defense Council, Inc. v. Gorsuch*, 685 F.2d 718, 727 (D.C.Cir.1982). In the landmark *Chevron* decision, the Supreme Court reversed, and established the overriding principle to which the majority pays lip service. In *Chevron*, the High Court emphasized that the sort of policy considerations inherent in decisions as to means of implementation "are more properly addressed to legislators or administrators, not to judges." *Chevron*, 467 U.S. at 864, 104 S.Ct. 2778. Just so here. Where the interpretation by the agency otherwise survives the two-step analysis under *Chev-*

*ron,* I do not see how this court can strike that interpretation as unreasonable merely on the basis that it does not in our view advance the overriding policy of the statutory scheme.

True, Congress passed the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1); *see* Maj. Op. at 866. However, the Clean Air Act contains hundreds of specific commands to EPA from Congress. Some directives explicitly tell EPA to consider, *inter alia,* environmental impact, cost considerations, or technological feasibility. Others direct EPA to engage in managerial functions pursuant to the environmental, cost, technological, or other factors which prompted Congress to move EPA to action. Here, EPA created a rule to execute a managerial function established by statute. EPA did nothing to frustrate the Clean Air Act's broader goal of promoting the health, welfare, or productivity of the public. We can ask no more.

Nor is *American Petroleum Institute v. EPA,* 52 F.3d 1113 (D.C.Cir.1995), relied upon by petitioners to the contrary. Indeed, that decision supports the position of EPA, not that of the petitioners. In *API,* we considered a petition seeking review of EPA regulations promulgated pursuant to 42 U.S.C. § 7545(k)(1). That section, also part of the Clean Air Act, empowered EPA to "establish[ ] requirements for reformulated gasoline to be used in gasoline-fueled vehicles in specified nonattainment areas." 42 U.S.C. § 7545(k)(1). The statute mandated that the regulations were to be directed toward "the greatest reduction in emissions of ozone forming volatile organic compounds .... and emissions of toxic air pollutants ... achievable through the reformulation of conventional gasoline...." *Id.* EPA issued regulations directed toward achieving not only the specified statutory goals, but also toward an increase in the use of renewable resources—no doubt a laudable goal, but not one specified by Congress in the empowering Act. We granted the petition for review, and struck down the regulations, precisely because EPA had used its regulatory proceeding to pursue goals beyond those set forth in the empowering statute. Today, the majority vacates another set of EPA regulations because EPA did not pursue goals not specified by Congress in the empowering sections under which EPA operated. in the promulgation of the regulations. I am not suggesting that it would have been unreasonable for EPA to have considered the overall goals as urged by the majority, but I do not see how under *Chevron* analysis it is within our jurisdiction to demand that EPA pursue the general statutory goals. The majority embarks on a dangerous course by using 42 U.S.C. § 7401(b)(1) as the means for a court to act as a superlegislator and rewrite the Clean Air Act to impose substantive requirements on EPA—a course forbidden by the Supreme Court in *Chevron.*

Finding nothing illegal in EPA's choice of means to implement "compliance as expeditiously as practicable," I dissent.