AMERICAN BIOSCIENCE,
INC. Plaintiff,

v.

Donna E. SHALALA, et
al., Defendants.

No. CIV.A. 00–2247 CKK.

United States District Court,
District of Columbia.

Oct. 3, 2000.

Arthur YaShih Tsien, Olsson, Frank & Weeda, P.C., Washington, DC, Joseph F. Coyne, Sheppard, Mullin, Richter & Hampton, LLP, Los Angeles, CA, for Plaintiff.

Drake Stephen Cutini, U.S. Department of Justice Office of Consumer Litigation, John D. Kiser, Richard Melvyn Cooper, Williams & Connolly, Edward Bennett Williams, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

Plaintiff American Bioscience, Inc. ("ABI"), which holds a patent related to the anti-cancer drug paclitaxel, claims that Defendant Food and Drug Administration ("FDA") improperly approved the applica-

tion of Intervenor Baker Norton Pharmaceuticals ("BNP")[1] to market the drug generically. Intervenor Bristoll–Myers Squibb Company ("BMY") currently sells the drug under the brand name Taxol. In its Complaint, ABI asks the Court to direct FDA to rescind its approval of BNP's generic version.

Before the Court is ABI's Motion for a Temporary Restraining Order or, in the Alternative, for a Preliminary Injunction. As the parties have agreed, the Court addresses the proposed temporary restraining order and preliminary injunction simultaneously. Upon consideration of the motion, Defendants' opposition, ABI's reply, and the Intervenors' submissions, as well as supplemental pleadings ordered by the Court, the Court concludes that neither a temporary restraining order nor a preliminary injunction is warranted.

## I. BACKGROUND

### A. Statutory Framework

This case revolves around the interpretation of the statutory framework that governs the marketing of generic drugs. A generic drug contains the same active ingredients, but not necessarily the same inactive ingredients, as a brand-name prescription drug. *United States v. Generix Drug Corp.,* 460 U.S. 453, 455, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983). Ready availability of generic drugs is believed to benefit consumers by increasing competition and reducing prices. All drugs, including generic drugs, must receive FDA approval before they can be marketed. Typically, a drug manufacturer wishing to market a new drug (so-called "pioneer manufacturers") must complete a New Drug Application ("NDA") in order to obtain FDA approval. The applicant must submit "data from studies showing the drug's safety and effectiveness," which renders the NDA process both time-consuming and expensive. *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1063 (D.C.Cir.1998).

Under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FFDCA"), the holder of an approved NDA (the entity with the right to sell a brand-name drug) must inform the FDA of any patents that could reasonably be asserted to cover the drug in question. This is known as "listing" the patents with the FDA. *See* 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53. If a relevant patent is issued after the NDA is approved, the NDA holder has thirty days from the date the patent was issued to "list" the patent. *See* 21 U.S.C. § 355(c)(2); 21 C.F.R. § 314.53(d)(3).

The procedure for obtaining approval of generic drugs is less onerous than that faced by pioneer manufacturers. In 1984, in an effort to facilitate the entry of generic drugs into the market, Congress passed the Hatch–Waxman Amendments to the FFDCA, which significantly revised the generic drug approval process. Instead of preparing an NDA, the generic drug proponent can submit an Abbreviated New Drug Application ("ANDA"). *See* 21 U.S.C. § 355(j). Section 355 sets forth various requirements for the information that must be included in the ANDA. Unlike the pioneer manufacturer, who bears the burden of proving to the FDA that the active ingredient is safe and effective, the generic manufacturer bears the lesser burden of providing enough information to show that its product has the same active ingredient, labeling requirements, dosage form, and other essentials as a drug that

1. BNP intervened together with Zenith Goldline Pharmaceuticals, Inc. The Court refers to them collectively as "BNP."

has already been approved. *See id.* § 355(j)(2)(i)-(v). In other words, the generic manufacturer is allowed to rely on the safety and effectiveness data submitted in the pioneer's NDA.

To avoid the obvious patent infringement problems inherent in such a statutory scheme, § 355 also contains some protection for the holders of patents related to the approved brand-name drug. In addition to showing that the active ingredient in its drug is the same as the active ingredient in the brand-name drug, the ANDA applicant must also certify to the FDA that the generic version will not interfere with any patents that the NDA holder was required to "list." This can be accomplished by certifying

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) . . . the date on which such patent will expire, or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

*Id.* § 355(j)(2)(vii). The last of these, the so-called "Paragraph IV" certification, is the only certification at issue in this litigation.

In addition to the requisite certification to the FDA, the Paragraph IV ANDA applicant must also provide notice to the patent holder and to the NDA holder explaining why the generic version does not infringe the patent or why the patent is invalid. *See id.* § 355(j)(2)(B). If the patent holder does not bring a patent infringement action within forty-five days of receipt of that notice, the FDA may approve the ANDA effective immediately. *See id.* § 355(j)(5)(B)(iii). If the patent holder brings suit within forty-five days, the effective date of any FDA approval is delayed, either for thirty months or until

the court concludes that the patent is invalid or has not been infringed, whichever is shorter. *See id.*

## B. The Factual Scenario of this Case

In 1992, the FDA approved BMY's New Drug Application for the anti-cancer drug paclitaxel, which BMY has subsequently marketed under the brand name Taxol. *See* Compl. ¶ 17. On July 30, 1997, BNP submitted an ANDA for a generic version of the drug. *See* Mem. of P. & A. in Supp. of the Mot. of Pl. [ABI] for a T.R.O. or, in the Alternative, for a Prelim. Inj. [hereinafter "Pl.'s Mot."] Ex. 5 (Aug 28, 2000, FDA letter to BNP). Following that submission, BMY listed two patents with the FDA, and BNP certified as to them under Paragraph IV. BMY thereupon initiated a patent infringement suit which delayed any FDA approval for thirty months. That thirty month period ended in June 2000. *See* Fed. Defs.' Mem. in Opp'n to Pl.'s Mot. for a T.R.O. or Prelim. Inj. at 9 [hereinafter "FDA's Opp'n Mem."]; Mem. of Defs. Intervenors [BNP] in Opp'n to Pl.'s Mot. for a T.R.O. or, in the Alternative, for Prelim. Inj. at 2, 4–5 [hereinafter "BNP's Opp'n Mem."].

On August 1, 2000, ABI received a patent for a novel dosage form of Taxol (" '331 patent"). *See* Pl.'s Mot. Ex 3(A)(b) (printout from U.S. Patent and Trademark Office website). Ten days later, ABI sued BMY in U.S. District Court in California to compel BMY to list the '331 patent. That same day, the California court issued a Temporary Restraining Order ("TRO") directing BMY to list the '331 patent "subject to the proviso that, unless [ABI] carries its burden of proof [regarding a preliminary injunction], BMY shall then take all steps under its control to cause the delisting" of the '331 patent. *See* Compl. Ex. 1(B) at 2(TRO). BMY, which had requested the TRO's narrow language and

proviso, complied with the requirements the same day, August 11, 2000. *See* BNP's Opp'n Mem. Ex. 4 at 16–17 (Tr. of 9/16/00 hearing before Judge Byrne) (describing BMY's desire for limitation on scope and requirements of the TRO); Compl. Ex. 3 (BNP's August 11, 2000, submission to the FDA). At that time, only ten of the thirty days allotted for listing had expired.

On August 14, 2000, BNP submitted a Paragraph IV certification in which it acknowledged the recently listed '331 patent, but stated that its ANDA would not result in infringement. *See* Pl.'s Mot. Ex. 5 (Aug. 28, 2000 FDA letter to BNP); FDA's Opp'n Mem. at 14. Two weeks later, the FDA informed BNP that it had completed its substantive review of BNP's ANDA, but that it could not issue final approval until the questions about the '331 patent had been resolved. *See* Pl.'s Mot. Ex. 5.

Simultaneously, in the California lawsuit between ABI and BMY, BNP moved to intervene and argued for dismissal on the ground, *inter alia*, that there is no private right of action under the FFDCA. *See* BNP's Opp'n Mem. Ex. 8 at 3 (BNP's August 18, 2000, Mem. in Opp'n to Pl.'s Mot. for Prelim. Inj. & in Supp. of BNP's Mot. to Dismiss and for Enforcement of the Contingent Provision of the T.R.O.). Over the course of three hearings on the record held in August and September, the California court reviewed the circuitous history of the litigation, probed the parties in an effort to understand their motivations and affiliations, and questioned its own authority to render judgment in the matter. *See* BNP's Opp'n Mem. Exs. 3 (Tr. of 8/21/2000 hearing), 4 (Tr. of 9/6/2000 hearing), 17 (Tr. of 9/7/2000 hearing).

During the August 21 hearing, BMY, ABI and BNP discussed the schedule for resolving the outstanding motion for a pre-liminary injunction. While none of the three informed the judge that the thirty-day listing window would close on August 31, BNP pushed the court to hold a hearing on the preliminary injunction (and the possible dissolution of the TRO) *prior* to that date. Oddly, both BMY and ABI, the parties with the greatest interest in ensuring proper and timely listing of the '331 patent, opposed holding the hearing so early and urged the court to extend the TRO as long as the Federal Rules would allow. *See* BNP's Opp'n Mem. Ex. 3 at 26–34.

At the September 6 hearing, BMY made clear that it was unwilling to list the '331 patent without a court order requiring it to do so. *See* BNP's Opp'n Mem. Ex. 4 at 41–43. At the same hearing, the court ruminated on its power to enforce compliance with the FFDCA and determined that it lacked jurisdiction to do so. *See id.* Ex. 4 at 107 ("I find that the court did not have jurisdiction over this matter at the time that Judge Rea was presented with the T.R.O. that he issued requiring listing of the ['331] patent.").

On September 7, 2000, the California court dismissed the case, which included the FFDCA claim and state law claims, under Rule 12(b)(6). In the order announcing the dismissal, the court noted that ABI did not have a private right of action under the FFDCA. Accordingly, the court dissolved the TRO and commanded that "[p]ursuant to the condition in the TRO and in order to restore the status quo, BMY shall use its best efforts to cause the de-listing of [ABI's] Patent .... ABI shall cooperate with BMY in its efforts to delist the '331 Patent pursuant to the TRO." Compl. Ex. 5 ¶¶ 1–4 (September 7, 2000, dismissal order). The effective date of the dissolution was stayed until September 13 in order to give the parties an opportunity to appeal. *See id.* ¶ 11.

The court also noted that, at the time the TRO was issued, BMY had twenty more days within which to file its listing of the '331 patent. Since those twenty days had expired by the time the TRO was dissolved, the court "recommend[ed] to the FDA that the time that the TRO was in effect should toll the period in which BMY may timely cause such listing." *Id.* ¶ 5.

Also on September 7, 2000, ABI brought a patent infringement suit against BNP in the Central District of California. *See* Pl.'s Mot. Ex. 3(H). ABI informed the FDA of this litigation on September 8, 2000, and asserted that the lawsuit barred the FDA from approving BNP's ANDA for thirty months. *See* Pl.s' Mot. Ex. 7.

On September 11, 2000,[2] BMY sent another letter to the FDA listing the '331 patent. In that letter, BMY did not reference its August 11 listing pursuant to the TRO, and it did not indicate that it believed that the patent was already listed in some manner. *See* Pl.'s Mot. Ex. 9. According to the FDA, the September 11 letter amounted to a "late listing" of the '331 patent. *See* Tr. of 9/29/00 Hearing Before Judge Kollar–Kotelly at 47 [hereinafter "9/29/00 Tr."]. In the view of BNP, the September 11 letter is a nullity because BMY had already listed the '331 patent via its August 11 letter. *See* BNP's Opp'n Mem. at 18.

On September 14, 2000, after the California court's dismissal order took effect, BMY withdrew its August 11 listing of the '331 patent "to the extent that listing was compelled by the TRO." Pl.'s Mot. Ex. 10 (BMY letter to FDA, 9/14/2000). BMY also expressly stated that the withdrawal did "not affect the continued and continuous listing of the patent." *Id.* Ex. 10. The FDA and BNP agree that this letter com-

pletely removed the August 11 listing. The FDA maintains that BMY's voluntary, but tardy, listing on September 11 is still on the books. *See* 9/29/00 Tr. at 47. BNP argues that the September 11 listing is a nullity and that, therefore, no listing remained after BMY's September 14 withdrawal letter. *See* BNP's Opp'n Mem. at 19–24.

Also on September 14, BNP amended its Paragraph IV certification by withdrawing its previous acknowledgment of the '331 patent. BNP took this step because BMY "has withdrawn ... the '331 patent listing ..., and BNP is not required to certify any subsequent listing ... that was made more than 30 days after" ABI received the patent. FDA's Opp'n Mem. Ex. B (letter from BNP to FDA).

In apparent disregard of the California court's recommendation that it toll the thirty-day period, the FDA granted final approval for BNP's ANDA on the generic version of paclitaxel on September 15, 2000. *See* FDA's Opp'n Mem. Ex. C (FDA letter to BNP). Notwithstanding that approval, BNP has agreed not to ship the drug to market until Tuesday, October 2, 2000. *See* 9/29/00 Tr. at 54–55.

On September 20, 2000, ABI filed its Complaint in this action, together with a motion for a temporary restraining order or a preliminary injunction. The Court held a motions hearing on the record on September 29, 2000, at which the parties consented to combined consideration of the temporary restraining order and preliminary injunction. *See* 9/29/2000 Tr. at 55. The record of that hearing is incorporated herein as part of this Memorandum Opinion.

---

**2.** Also on September 11, BMY filed suit in the Southern District of New York against ABI and BNP seeking a declaratory judgment re-

garding its obligation to list the '331 patent. *See* BNP's Opp'n Mem. Ex. 20 (BMY's Complaint).

## II. DISCUSSION

■ In determining whether to grant a litigant injunctive relief via a temporary restraining order or a preliminary injunction, district courts must balance four factors: (1) whether the litigant is substantially likely to succeed on the merits; (2) whether the litigant would suffer irreparable injury if the injunction is not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction. *See Mova Pharm. Corp.*, 140 F.3d at 1066 (citing *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir. 1995)).

### A. Substantial Likelihood of Success on the Merits

In order to demonstrate a substantial likelihood of success, ABI must show that the FDA's interpretation of the statute is arbitrary, capricious, not in accordance with the law, or unwarranted by the facts. *See* 5 U.S.C. § 706(2). To do so, ABI may illustrate the adoption of improper regulations or highlight the faulty application of statutory directives.

In order to determine whether the FDA's interpretation of the statute is valid, the Court must ask whether "Congress has directly spoken to the precise question at issue;" if so, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *Mova*, 140 F.3d at 1067. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *Mova*, 140 F.3d at 1067. So long as the agency's interpretation is "reasonable and consistent with the statute's purpose," the Court must defer to the agency's interpretation. *See Chemical Mfrs. Ass'n v. EPA*, 217 F.3d 861, 866 (D.C.Cir.2000) (quoting *Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C.Cir.2000)).

### 1. BMY Did Not List the '331 Patent Within 30 Days

■ In this case, ABI argues that the FDA acted arbitrarily and capriciously by granting BNP final approval for its generic version of paclitaxel. More specifically, ABI asserts that (1) BMY listed the '331 patent on August 11; (2) BNP, seeking ANDA approval, filed a Paragraph IV certification with FDA in reaction to that listing; and (3) in response to that Paragraph IV certification, ABI filed a patent infringement lawsuit. ABI argues that, under these circumstances, the FFDCA requires the FDA to withhold final approval until thirty months have passed or the court considering the patent action determines that the patent is invalid or not infringed. *See* Pl.'s Mot. at 16–17. In their opposition, the FDA argues that BMY never properly listed the '331 patent and that, therefore, none of the rights and obligations that derive from such a listing have taken effect. *See* Defs.' Opp'n at 21–26.

In brief, ABI's likelihood of success on the merits depends on whether it will be able to show that the FDA's determination that BMY had not listed ABI's patent within thirty days of the patent's issuance was contrary to the plain meaning of the statute, or, in the alternative, that the statutory language is ambiguous and the FDA's interpretation is not based on a "permissible construction" of the statute. Under the statute in question, the holder of an approved NDA

> shall file with the Secretary the patent number and the expiration date of any patent which claims the drug for which

the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted ... not later than thirty days after the date the patent is issued.

21 U.S.C. § 355(c)(2).

It is undisputed that the '331 patent was issued on August 1, 2000. ABI asserts that BMY complied with the thirty-day window of section 355(c)(2) by listing the '331 patent on August 11, 2000. In the letter by which it made that alleged listing, BMY informed the FDA that it was submitting the patent information "[p]ursuant to an order of the United States District Court for the Central District of California." *See* Compl. Ex. 3 (BMY letter to FDA). BMY did not indicate that it was submitting the patent information for any other reason.

The court order to which BMY referred was the TRO issued by the district court in California on August 11, 2000. *See* Pl.'s Mot. Ex. 3(B) (California T.R.O.). In that order, Judge Rea instructed BMY to list the '331 patent "subject to the proviso that, unless [ABI] carries its burden of proof on the [Order to Show Cause], BMY shall then take all steps under its control to cause the de-listing" of the '331 patent. *Id.* at 2. BMY has subsequently acknowl-

edged that it specifically requested that Judge Rea include that proviso. *See* BNP's Opp'n Mem. Ex. 4 at 16–17 (Tr. of 9/16/00 hearing before Judge Byrne). In other words, Judge Rea accepted BMY's proposed language and ordered BMY to submit its temporary listing pursuant to the TRO, pending resolution of the motion for a preliminary injunction. As BMY indicated in its August 11 submission letter to FDA, it listed the '331 patent information only pursuant to the limited TRO that it had helped to craft.

On September 7, 2000, the California district court that had issued the TRO determined that ABI did not have a private right of action upon which to make an FFDCA claim. *See* Compl. Ex. 4 ¶ 1. Accordingly, the court dissolved its August 11, 2000, temporary restraining order, ordered "BMY [to] use its best efforts to cause the de-listing of plaintiff's '331 Patent," and dismissed the case under Rule 12(b)(6). *Id.* Ex. 4 ¶ 4.[3]

Notably, the California district court originally issued its TRO with a very narrow result in mind: BMY was to submit a provisional, temporary listing subject to complete de-listing pending the results of its Order to Show Cause on the Preliminary Injunction. Solely in order to comply with that narrow order, BMY submitted

---

**3.** The California court dismissed the suit under Rule 12(b)(6) of the Federal Rules of Civil Procedure (failure to state a claim). *See* Compl. Ex. 4 ¶ 1. The court's comments at a hearing held prior to the dismissal indicate further that it decided to dismiss under Rule 12(b)(6) because, by deploying that rule, it could dispose of the FFDCA claim, rooted in federal question jurisdiction, as well as associated state law claims properly founded on diversity. *See* BNP's Opp'n Mem. Ex. 4 at 107 & *passim* (9/6/00 Hearing).

The 12(b)(6) dismissal does not change the fact that the California court disposed of the FFDCA claim because it determined that there was no private right of action under the statute and that, therefore, the court lacked

jurisdiction to compel BMY to list the patent. *See id.* Ex. 4 at 107 (9/6/00 Hearing) ("I find that the court did not have jurisdiction over this matter at the time that Judge Rea was presented with the T.R.O. that he issued requiring listing of the ['331] patent.")

This Court notes that the California court's discovery of a jurisdictional shortcoming rendered any preceding orders devoid of legal effect, including the August 11 TRO. As noted above, BMY submitted its listing of the '331 patent solely in order to comply with that TRO. Since BMY listed the patent solely to comply with the TRO, and since the TRO was without legal authority, this Court observes that BMY's August 11 submission may itself be barren of legal significance.

the relevant patent information to the FDA on August 11, 2000. When the California court subsequently dissolved the TRO and ordered delisting, BMY complied again, and de-listed the patent "to the extent that listing was compelled by the TRO." Compl. Ex. 7 (BMY letter to FDA de-listing patent, 9/14/00).[4]

Because BMY's August 11 listing was prompted solely by the TRO, and because BMY withdrew that listing to the extent it was compelled by the TRO, BMY de-listed its August 11 listing altogether. Since BMY had submitted nothing else to the FDA regarding the '331 patent before August 31, the Court concludes that BMY did not list the patent within the statutory thirty-day filing period. Further, to the degree that ABI argues that BMY's August 11 listing qualifies on its own as a listing within the thirty-day period, the Court disagrees. BMY expressly limited the extent of its August 11 submission; accordingly, the Court concludes that BMY and ABI are estopped from asserting that the submission had any lasting purpose independent from compliance with the limited TRO.

Accordingly, ABI's argument that FDA acted improperly in finding that BMY did not list the '331 patent within thirty days is not substantially likely to succeed on the merits. Without that threshold listing, the sequence of statutory events that ABI describes in its Complaint was not triggered.

### 2. *There Is No Basis For Equitable Tolling*

■ ABI also argues that the FDA acted arbitrarily and capriciously by failing to heed the California court's recommendation that the FDA toll the thirty-day period within which an NDA holder such as BMY must list relevant patents. In support of that argument, ABI refers the Court to two cases that, in ABI's view, establish the power of courts to toll statutory or regulatory deadlines in situations comparable to the one faced by the California court. *See* [ABI]'s Reply to the Mem. of Def. [FDA] & Intervenor–Def. [BNP] in Opp'n to Pl.'s Mot. for a T.R.O. or, in the Alternative, for a Prelim. Inj. at 13–15 [hereinafter "Pl.'s Reply"]; *Andrulis Research Corp. v. U.S. Small Bus. Admin.*, 1990 WL 169318 (D.D.C.1990); *Burr v. Ambach*, 863 F.2d 1071 (2d Cir.1988).

As a threshold matter, the Court rebukes ABI for failing to summon any support for this argument before doing so in its reply brief. By omitting such information from all submissions other than its last, ABI prevents the Court from receiving and considering pertinent argument and counterargument from the FDA and the intervenors. Nonetheless, despite ABI's improper pleading and the consequent lack of reaction from the other parties, the Court is able to assess the argument in full, and it concludes that ABI is not substantially likely to succeed on the merits of this argument.

First, the California court merely "recommended" that the FDA toll the thirty-day listing period. *See* Compl. Ex. 5 ¶ 5. As the California court noted in a hearing prior to issuing the order, it was not di-

---

4. On September 11, 2000, after the thirty-day listing period had ended, BMY submitted the '331 patent information to the FDA again, this time without any language indicating that it acted solely pursuant to the TRO. *See* Compl. Ex. 6. As described in greater detail below, the FDA views that submission as a "late listing" of the '331 patent.

On September 14, 2000, BMY wrote to the FDA yet again and withdrew the listing to the extent it had been ordered by the TRO. *See* Compl. Ex. 7. Since the August 11 listing was prompted only by the TRO, the September 14 letter withdrew that listing altogether, leaving only the tardy September 11 listing on the books.

recting the FDA to do anything; rather, it simply intended to let the FDA decide for itself after considering the court's recommendation. *See* BNP Opp'n Mem. Ex. 4 at 108–09 ("I'm leaving it to the FDA, but telling them what I think it should be.")[5]

Second, the cases on which ABI relies are inapposite because they do not support the argument that ABI makes and because they are factually distinct from the present dispute. Fundamentally, the courts in *Andrulis* and *Burr* did not hold that a federal or state agency, acting solely on the recommendation of a court, has discretionary authority to toll a statutory deadline. Rather, in both cases, the courts ordered the agencies to toll, and presumably, the agencies complied. *See Andrulis,* 1990 WL 169318 at *2; *Burr,* 863 F.2d at 1079.

In *Andrulis,* the defendant was a federal agency; in *Burr,* the defendant was the commissioner of a state agency. *See Andrulis,* 1990 WL 169318 at *1; *Burr,* 863 F.2d at 1071. In the California litigation at issue here, wherein the court recommended that the FDA toll the thirty-day listing period, ABI had sued BMY. The FDA was not a party to that litigation, nor did it seek to intervene. In *Andrulis* and *Burr,* the plaintiffs did not play an active role in allowing the statutory deadline to expire. In this case, ABI (and BMY) urged the California court to extend the TRO as long as the Federal Rules would allow— well past the thirty-day listing deadline and into September.

Further, in both *Andrulis* and *Burr,* the courts determined that the defendants had acted in bad faith. *See Andrulis,* 1990 WL 169318 at *2; *Burr,* 863 F.2d at 1075–76. Accordingly, in those cases, the courts re-

quired the defendants to toll a pertinent deadline in order to remedy their bad faith actions. *See Andrulis,* 1990 WL 169318 at *2; *Burr,* 863 F.2d at 1079. In the California litigation, there were no allegations that FDA had acted in bad faith. Rather, ABI simply sought to compel BMY to list the '331 patent despite BMY's allegedly improper desire not to list.

Finally, apart from the substantive inapplicability of the two cases, neither provides binding precedent for this Court. *Andrulis* carries no precedential weight because it is an unpublished opinion. *See Milton S. Kronheim & Co. v. District of Columbia,* 91 F.3d 193, 197 ("Our circuit rules ... forbid[ ] the citation of unpublished opinions as precedent."). *Burr,* although published, is not binding precedent because it was decided in another circuit. *See Northwest Forest Resource Council v. Dombeck,* 107 F.3d 897, 900 ("The district courts, like the courts of appeals, owe no obedience to the decisions of their counterparts in other districts, nor to the decisions of the courts of appeals in other circuits.").

In sum, the Court concludes that ABI is unlikely to prevail on its argument that FDA was required to abide by the California court's recommendation that it toll the thirty-day period. The cases upon which ABI relies do not provide support for its argument, and, furthermore, they are not binding on this Court.

### 3. The Late Listing Regulation Protected BNP From Having to Certify As To The Late–Listed Patent

■ In defense of its decision to approve BNP's ANDA, the FDA argues in

---

5. The court's recommendation to the FDA was ancillary to its dismissal of the FFDCA claim. *See* Compl. Ex 5 ¶¶ 1–5. As described above, that dismissal was rooted in the court's determination that it lacked jurisdiction to consider ABI's FFDCA claim. *See*

*supra* note 2. Without jurisdiction, the California court was not empowered to issue directives of any kind related to the FFDCA claim. Accordingly, its recommendation to the FDA was without legal force.

its opposition that BNP was not required to amend its certification to reflect BMY's September 11 listing. *See* FDA's Opp'n Mem. at 14, 21. Because BMY submitted that listing after the thirty-day listing period had expired, the FDA contends that BNP is protected by the FDA's "late listing" regulation. *See id.;* 21 C.F.R. § 314.94(a)(12)(vi).[6]

In its reply, ABI argues that the FDA has acted contrary to its own "late listing" regulation in determining that BNP is protected. *See* Pl.'s Reply at 16–20. ABI explains its argument by noting that the regulation would only protect BNP if BNP had already filed "an appropriate patent certification" at the time that BMY belatedly listed the '331 patent. *See* Reply at 17 (quoting 21 C.F.R. 314.94(a)(12)(vi)). ABI then argues that BNP's Paragraph IV certification was not "appropriate" because BNP had not notified ABI and BMY of the certification, as required by the statute and the regulations. *See id.* at 18–19; 21 U.S.C. § 355(j)(2)(B)(iii); 21 C.F.R. § 314.95(d). Since the certification was not appropriate, ABI argues, the regulation does not protect BNP from the requirement that it re-certify so as to reflect the late-listed '331 patent. *See* Pl.'s Reply at 19–20. Accordingly, ABI concludes that the FDA acted in contravention of its regulation when it determined that BNP was protected. *See id.* at 20.

In its supplemental memorandum, FDA concedes that "appropriate" is not defined in the regulations. *See* Fed. Defs.' Supplemental Mem. in Opp'n to Pl.'s Mot. for a T.R.O. or Prelim. Inj. at 2 [hereinafter "FDA's Suppl. Mem."].[7] Nonetheless, FDA asserts that "appropriate" refers not to whether an ANDA applicant has provided *notice* of a Paragraph IV certification, but rather whether the applicant has *certified* under the correct Paragraph. *See id.* More specifically, the FDA demonstrates that the statute and the regulations treat "certification" and "notice" as separate ANDA requirements. *See id.* at 3; *compare* 21 U.S.C. § 355(j)(2)(A)(vii) *with* 21 U.S.C. § 355(j)(2)(B)(ii); *compare* 21 C.F.R. § 314.94(a)(12) *with* 21 C.F.R. § 314.95. Accordingly, having noted that the "late listing" regulation alludes only to "certification" and not to "notice," the FDA concludes that "notice" is irrelevant to the regulation's operation. *See* FDA's Suppl. Mem. at 3–4.

■ This Court is required to "give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citing *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)). In such cases, "[t]he agency's

---

6. The "late listing" regulation to which FDA refers provides as follows:

   If a patent on the listed drug is issued and the holder of the approved application for the listed drug does not submit the required information on the patent within 30 days of issuance of the patent, an applicant who submitted an abbreviated new drug application for that drug that contained an appropriate patent certification before the submission of the patent information is not required to submit an amended certification. An applicant whose abbreviated new drug application is submitted after a late

   submission of patent information, or whose pending abbreviated application was previously submitted but did not contain an appropriate patent certification at the time of the patent submission, shall submit a certification under paragraph (a)(12)(i) of this section or a statement under paragraph (a)(12)(iii) of this section as to that patent.
   21 C.F.R. § 314.94(a)(12)(vi).

7. Because ABI first raised this argument in its reply brief, the Court permitted the FDA and BNP to file supplemental opposition briefs and ABI to file a supplemental reply.

construction of its own regulations is controlling 'unless it is plainly erroneous or inconsistent with the regulation.'" *Wyoming Outdoor Council v. U.S. Forest Service,* 165 F.3d 43, 52 (D.C.Cir.1999) (quoting *National Med. Enter. v. Shalala,* 43 F.3d 691, 697 (D.C.Cir.1995)). In other words, "[s]o long as an agency's interpretation of ambiguous regulatory language is reasonable, it should be given effect." *Wyoming Outdoor Council,* 165 F.3d at 52 (citing *Martin,* 499 U.S. at 150, 111 S.Ct. 1171). This extensive deference is particularly warranted when "the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381 (quoting *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)).

The "late listing" regulation at issue in this case concerns a regulatory program covering the high-stakes interplay between patent-holders, brand-name drug manufacturers, and applicants seeking permission to market drugs generically. Unquestionably, this regulatory program is "complex and highly technical." *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. 2381. Furthermore, in light of the competing market and social interests related to the development of new medications and the marketing of generic equivalents, it "entail[s] the exercise of judgment grounded in policy concerns." *Id.* Accordingly, the Court determines that the FDA's interpretation of its "late listing" regulation warrants extensive deference.

Applying that broad deference, the Court concludes that the FDA's interpretation and application of the "late listing" regulation are not "plainly erroneous or inconsistent with the regulation." *Wyoming Outdoor Council,* 165 F.3d 43. The FDA's determination that "appropriate" refers to the category of certification, and not to compliance with notice requirements, is reasonable. Its explanation of the statutory and regulatory distinctions between the concepts of "certification" and "notice" supports that view. Accordingly, the Court finds that the FDA did not act contrary to its own regulations in determining that the "late listing" regulation protects BNP from required re-certification.

#### 4. The Late Listing Regulation Is Not Invalid

██ In its reply brief, ABI also argues that the "late listing" regulation is invalid because it is contrary to the FFDCA, its enabling statute. *See* Pl.'s Reply at 20 (construing 21 C.F.R. § 314.94(a)(12)(vi)). In particular, ABI claims that the statute adequately covers situations in which an NDA holder fails to list a patent within thirty days. *See id.* at 21. First, ABI argues that the statute allows ANDA applicants to certify under Paragraph I if the NDA holder has not timely listed. *See id.* at 21–22 (construing 21 U.S.C. § 355(j)(5)(B)(iii)). Second, ABI maintains that the statute requires the FDA to rescind an NDA holder's approval if the NDA does not list within thirty days of receiving notice from the FDA. *See id.* at 21 (construing 21 U.S.C. § 355(e)(4)). Based on these statutory requirements, ABI reasons that the FDA has exceeded its statutory authority by promulgating a regulation that allows for flexibility in an otherwise rigid, statutory time frame.[8]

---

**8.** In its supplemental reply, ABI buttresses its argument that the regulation is invalid by

referring to the transcript of a 1995 motions hearing in this district. In that hearing,

In its supplemental opposition, the FDA concedes that there is no direct statutory authority for the late listing regulation. *See* FDA's Suppl. Mem. at 9. It asserts, however, that the regulation merely fills a hole that Congress left in the statutory scheme. *See id.* Specifically, the FDA argues that the FFDCA requires NDA holders to list relevant patents within thirty days, *see* 21 U.S.C. § 355(c)(2), without indicating what happens in the event that an NDA holder fails to do so. *See* FDA's Suppl. Mem. at 7–9. The agency asserts that its "late listing" regulation fills that gap, and that it does so in a manner consistent with the statutory sanctions and incentives that ABI describes. *See id.* at 8–11.

Upon review of the statute and the parties' arguments, the Court determines that (1) the FFDCA is silent on the issue in question, and (2) the FDA's gap-filling regulation is a permissible interpretation of the statute because it is "reasonable and consistent with the statute's purpose." *Chemical Mfrs. Ass'n*, 217 F.3d at 866 (quoting *Independent Ins. Agents of Am., Inc.*, 211 F.3d at 643). Accordingly, the Court concludes that ABI's argument that the FDA acted arbitrarily and capriciously in promulgating its "late listing" regulation is not likely to succeed on the merits.

First, the FFDCA does not provide the FDA with any instruction on how to proceed if an NDA holder fails to list a quali-fied patent within thirty days. As ABI notes, the statute does allow ANDA applicants to submit a Paragraph I certification if no qualified patents have been listed. *See* Pl.'s Reply at 22 (construing 21 U.S.C. § 355(j)(2)(A)(vii)).

In this case, however, BNP was never in a position in which it could certify under Paragraph I. First, when BNP amended its certification on August 14, it did so in order to reflect the fact that BMY had listed the '331 patent pursuant to the California court's TRO. Because the patent was provisionally listed, Paragraph I certification was not an available option. Similarly, when BNP amended its certification again on September 14 to reflect BMY's withdrawal of its August 11 listing, it could not avail itself of Paragraph I. Since BMY had voluntarily (and belatedly) listed the '331 patent on September 11, BNP could only properly certify under Paragraph IV. In short, Congress did not address the current situation by providing ANDA applicants with the option of Paragraph I.

As ABI notes, the FFDCA also provides that the FDA "shall ... withdraw approval of an application [such as BMY's NDA] if the Secretary finds [that] the patent information ... was not filed within thirty days after receipt of written notice from the Secretary specifying the failure to file

which related to the application of the "late listing" regulation, Judge Royce Lamberth found that "the actions of the [FDA] here are irrational and cannot withstand judicial scrutiny." *See* Supplemental Reply Mem. of Pl. [ABI] at 7 & Ex. C (9/19/95 Tr. of Mot. Proceedings Before Judge Lamberth) at 39. ABI argues that Judge Lamberth's ruling supports its contention that the regulation is invalid.

The 1995 hearing transcript does not assist ABI in this matter because it concerns an unrelated factual situation in which the NDA holder was precluded from listing a particular patent within the thirty days because of a lack of scientific data. In this case, BMY could have listed the '331 patent at any time during the thirty-day window. Judge Lamberth's decision was limited to the FDA's actions under the regulation in that particular situation, and therefore does not impact upon this Court's analysis.

Additionally, the Court notes that an unpublished transcript of a motions hearing would not provide binding precedent even if its holding relied upon the same factual arrangement.

such information." 21 U.S.C. § 355(e)(4); *see also* Pl.'s Reply at 21.

The plain language of this statutory provision demonstrates that it does not cover the late listing situation at issue here. Most notably, Section 355(e)(4) can only take effect *if* the FDA provides written notice to the NDA holder that it has failed to list as required. *See* 21 U.S.C. § 355(e)(4) Even then, the statute only requires withdrawal of the NDA if, thirty days after receipt of the notice, the NDA holder still has not listed the patent in question. *See id.* The statute does not require the FDA to issue such notice and, in this case, the FDA did not do so.[9] Accordingly, the sanction envisioned in Section 355(e)(4) was not triggered.

Moreover, the statutory sanction of Section 355(e)(4) only arises if the FDA provides "due notice and opportunity for hearing to the applicant." 21 U.S.C. § 355(e). In this case, FDA provided BMY with neither. Accordingly, section 355(e)(4) does not apply.

Second, having determined that there is a gap in the FFDCA's coverage of the consequences of late listing, the Court assesses the FDA's interstitial regulation and concludes that it is permissible under *Chevron.* As the FDA argues, the Hatch–Waxman Amendments to the FFDCA have two separate, and arguably incongruous, purposes. Title I of the Amendments aims. "to make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs." H.R.Rep. No. 98–857, pt. 1. Title

II, on the other hand, was designed "to create a new incentive for increased expenditures for research and development of certain products which are subject to pre-market government approval." *Id.* These two purposes compete with one another because wider availability of generic counterparts reduces the brand-name profits that encourage greater spending on the development of new drugs.

The FDA's "late listing" regulation is a reasonable effort to reconcile the Amendments' cross-purposes. On the one hand, it supports research and development by declining to impose an iron-clad requirement that all patents must be filed within the thirty day period. Under the late listing regulation, NDA holders can benefit from the public notice that stems from listing even if that listing takes place after the thirty days. On the other hand, while allowing late listings, the regulation protects generic manufacturers from the disruptive requirement of re-certifying with regard to belated patent submissions.

ABI contends that regardless of the degree to which the regulation walks the fine line between the interests of the NDA holder and the ANDA applicant, it ignores the rights of third-party patentees like ABI. *See* Pl.'s Suppl. Reply at 8–9. In support of its assertion that the Hatch–Waxman Amendments imbue it with third-party rights regarding late listing, ABI quotes the preamble to the FDA's regulations, in which the FDA notes that an NDA holder's failure to list a patent could injure a third-party patent holder. *See* Pl.'s Reply at 28; 59 Fed.Reg. at 50,344

---

**9.** ABI has not argued in this Court that the FDA *should* have exercised its discretion and notified BMY of its failure to timely list the '331 patent. Without that argument, and without any corresponding reaction from the FDA, the Court does not consider that issue.

The Court does note, however, that ABI informed the California court that it never contacted the FDA independently to urge it to compel the BMY listing. This Court also notes that there may not have been an appropriate opportunity for the FDA to issue a notice to BMY because the issue of BMY's obligation to list has been the subject of litigation in California and in this Court since August 11, 2000.

("The [FDA] disagrees with the assertion that the NDA applicant would be the only party injured by the failure to list a patent. The patent holder may be a person other than the NDA applicant and may be injured if the patented invention is made, sold, or used without the patent owner's knowledge or consent.") Nonetheless, despite the FDA's acknowledgment of the harm that may befall patentees like ABI, the FFDCA and the Hatch–Waxman Amendments provide absolutely no mechanism by which a third-party can effect a patent listing. In other words, the statutory scheme does not grant third-party patentees *any* rights related to the timing of the listing of patents. Since ABI does not enjoy statutory rights in this context, its argument that the FDA's regulation ignores its rights is unavailing.

In sum, the Court determines that the FFDCA does not address the consequences of an NDA holder's failure to list a patent within thirty days. The Court also concludes that the FDA's gap-filling "late listing" regulation reflects a permissible interpretation of the statute, particularly in light of the competing purposes of the Hatch–Waxman Amendments. Accordingly, the Court finds that ABI's argument that the FDA acted contrary to its statutory authority in promulgating its "late listing" regulation has little likelihood of success.

**B. Irreparable Harm**

■ The second factor that district courts must consider in deciding whether to grant preliminary injunctive relief is whether the party requesting the relief would suffer irreparable harm without it. *See Mova Pharm. Corp.*, 140 F.3d at 1066. For harm to qualify as irreparable, it "must be both certain and great." *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985). In order to show that the harm is "certain," a party may not rely on "bare allegations of what is likely to occur." *Id.* Rather, the party "must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* To demonstrate that the harm is "great," a party may not rely on evidence of monetary harm alone: "Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Id.*

■ In its motion, ABI argues that lack of injunctive relief will bar it from preventing infringement of the '331 patent *before* FDA issues its final approval of BNP's ANDA. *See* Pl.'s Mot. at 20–21. Without that antecedent ability to bar infringement, ABI argues that its "ability to maximize the value of the '331 patent is severely impaired" and that potential licensing arrangements may suffer. *Id.* at 22. Two separate declarations of ABI's Chief Executive Officer, Dr. Patrick Soon–Shiong, partially illuminate these vague allegations of harm.

In his first declaration, Dr. Soon–Shiong describes a few *potential* business opportunities that depend on injunctive relief. *See* Pl.'s Mot. Ex. 4 ¶¶ 8–9 (9/19/00 Declaration of Dr. Soon–Shiong). Further, without providing any detail, he states that allowing FDA to grant final approval of BNP's ANDA "is materially impairing, and will continue to materially impair, ABI's ability to attract new financing sources." *Id.* ¶ 10. In his supplemental declaration, Dr. Soon–Shiong makes draconian predictions about what *"could "* ensue without injunctive relief, and he avers that *"perhaps* the very existence of the company *may* be placed in jeopardy." Pl.'s Reply Ex. A ¶ 6 (9/25/00 Declaration of Dr. Soon–Shiong) (emphasis added); *see also id.* ¶¶ 7–8. Notwithstanding the claim that

ABI may be unable to attract "tens of millions of dollars" of financing, the supplemental declaration contains little more detail than the first. *Id.*

The harms that ABI describes are neither "certain" nor "great." ABI warns of looming, devastating injuries in a conclusory and conjectural fashion that is almost entirely devoid of necessary detail. Notably, ABI speculates about an ensuing corporate collapse, yet fails to support its fears with any precise information on, among other things, (1) its income or financing, (2) the degree to which an unfavorable decision (and resulting generic paclitaxel sales) would impact those figures, or (3) how that impact would translate into corporate devastation. Without such detail, and without an indication that these feared injuries amount to more than mere hypothesis, the Court cannot conclude that ABI faces "irreparable harm."

Additionally, the Court notes that ABI is currently pursuing a patent infringement action against BNP in federal court in California. If indeed BNP's generic drug will infringe on the '331 patent, ABI will presumably obtain relief in that infringement suit. That relief would certainly mitigate the threatened harm that ABI describes to this Court. Nonetheless, in its pleadings in this case, ABI has failed to indicate the "irreparability" of its potential injuries in light of the possible judgment it may obtain in California.

In short, ABI has warned of devastating consequences, but it has done so speculatively and without any useful detail. Accordingly, the Court concludes that ABI has failed to demonstrate that it will suffer irreparable harm if it is not awarded preliminary injunctive relief.

## C. Balancing the Harms and the Public Interest

In addition to considering ABI's likelihood of success on the merits and whether it would suffer irreparable harm without injunctive relief, the Court must assess whether an injunction would substantially injure other interested parties[10] and whether the public interest would be furthered by the injunction. *See Mova Pharm. Corp*, 140 F.3d at 1066. In light of the fact that ABI is unlikely to succeed on the merits and has not demonstrated that it will suffer irreparable harm, only a brief mention of these remaining two factors is necessary.

Not surprisingly, ABI argues that an injunction would not harm the FDA at all, and that any harm that befalls BNP would be the proper result of the operation of law. *See* Pl.'s Mot. at 22–23. Additionally, ABI asserts that there is a strong public interest (1) in requiring the FDA "to act lawfully and consistent with its statutory obligations" and (2) in respecting the congressional "determination that the public interest is better served by delaying entry of a generic drug." *Id.* at 23. The FDA, on the other hand, maintains that it would suffer real harm were an injunction to issue,[11] as would BNP. *See* FDA Opp'n

---

10. Apparently, all interested parties are now parties to this litigation: plaintiff ABI holds the '331 patent; intervenor BMY holds the NDA for paclitaxel/Taxol; intervenor BNP has submitted an ANDA that covers paclitaxel; and defendant FDA is charged with the duty of administering the statutory and regulatory scheme that governs the interaction among the other parties' patent and application interests.

11. The Court does not believe that a preliminary injunctive relief would cause the FDA any meaningful, direct harm. As a federal government agency, however, the FDA is charged with representing the public interest. Accordingly, the interests of the FDA are reflected in the Court's assessment of the impact that an injunction would have on the interests of the public.

Mem. at 30–32. The FDA also argues that the public interest would suffer without the cost-saving competition that Congress intended to foster by passing the FFDCA. *See id.* Like the FDA, BNP highlights the public interest in access to lower-cost generic drugs. *See* BNP's Opp'n Mem. at 44–45. BNP also states that an injunction could cost it "hundreds of millions of dollars in sales revenue" and points to the drop in its stock price that followed the issuance of the California court's TRO. *Id.* at 41–44.

Upon consideration of all of these positions, the Court concludes that preliminary injunctive relief would substantially harm BNP. The delay occasioned by an injunction would force BNP to irretrievably forego valuable sales of its generic version of paclitaxel. Moreover, ABI does not dispute the contention raised by BNP and the FDA that, unlike ABI, BNP would not have an alternative remedy following an unfavorable ruling to recoup any financial losses. *See* FDA's Opp'n Mem. at 31; BNP's Opp'n Mem. at 43. Additionally, ABI's arguments to the contrary notwithstanding, this Court has already determined that the FDA most likely acted lawfully in approving BNP's ANDA. Accordingly, there is no substance to ABI's argument that any harm BNP suffers is the proper result of the operation of law.

The Court also concludes that the public interest favors denying the motion for preliminary injunctive relief. In passing the Hatch–Waxman Amendments, Congress carefully balanced the competing public interests in increased access to generic drugs and in expanded development of expensive, and valuable, medications. *See* H.R.Rep. No. 98–857, pt. 1. In this case, the public interest more strongly favors greater access to generic paclitaxel because ABI and BMY, by voluntarily delaying the proceedings in the California court

beyond the thirty-day deadline, foreclosed the protections that the FFDCA provides. Additionally, ABI's argument that the public interest demands faithful application of law is unavailing because, as the Court has already determined, the FDA has most likely acted in accord with its statutory responsibilities.

In sum, the Court concludes that the final two factors also weigh against granting a temporary restraining order or a preliminary injunction. Not only would injunctive relief cause substantial harm to BNP, but it would also be directly contrary to the public interest.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that ABI is not entitled to a temporary restraining order or a preliminary injunction. Accordingly, ABI's Motion for a Temporary Restraining Order or, in the Alternative, for a Preliminary Injunction shall be denied. An Order accompanies this Memorandum Opinion.